704 F.2d 444
 Janice McKAY, Executrix of the Estate of Lt. Cdr. Malcolm
Wagner McKay, Deceased, Plaintiff-Appellant,
v.
ROCKWELL INTERNATIONAL CORPORATION, a Delaware corporation,
Defendant-Appellee.
Marie CARSON, Administratrix of the Estate of Frank J.
Carson, Deceased, Plaintiff-Appellant,
v.
ROCKWELL INTERNATIONAL CORPORATION, a Delaware corporation,
Defendant-Appellee.
 Nos. 81-5540 to 81-5543.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 5, 1982.
Decided April 20, 1983.
 
 Martin E. Jacobs, Irwin, Hale & Jacobs, Los Angeles, Cal., for plaintiffs-appellants.
 Robert Forgnone, Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendant-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before SNEED, and ALARCON, Circuit Judges, and HARDY*, District Judge.
 SNEED, Circuit Judge:
 
 
 1
 These are consolidated wrongful death actions arising out of two unrelated crashes of RA-5C naval aircraft in the waters off the coast of Florida. The widows of the two Navy pilots killed in the crashes seek damages from Rockwell International Corp. ("Rockwell"), the manufacturer of the RA-5C aircraft and its ejection system. The district court held that Rockwell was liable for the pilots' deaths because of defects in the aircraft's ejection system. Both the widows and Rockwell have appealed.
 
 
 2
 In this case we confront the question under what circumstances, if any, the doctrine of strict liability in tort, as set forth in section 402A of the Second Restatement of Torts, should be extended to cover manufacturers of military equipment that proves to be defective in design and injures members of the armed forces who are on active duty. We also must address the question whether, under the circumstances of this case, sections 388 and 389 of the Second Restatement impose liability on Rockwell. For the reasons set forth below we reverse the judgment of the district court and remand for further proceedings.
 
 I.
 FACTS
 
 3
 Rockwell, under contract with the United States Navy, began development in the mid-1950s of an aircraft capable of sustained flight at altitudes of up to 75,000 feet, and with a potential speed of two and a half times the speed of sound. In the early 1960s, the Navy decided to redesign the aircraft as a supersonic carrier-based reconnaissance aircraft, designated the RA-5C "Vigilante." The RA-5C was put into use by the Navy in 1962 and was used extensively in Vietnam.
 
 
 4
 Both the RA-5C aircraft involved in the accidents out of which these cases arise were equipped with the HS-1A escape system. This system was a modified version of an earlier escape system in use in the RA-5C aircraft. The HS-1A system operated by physically restraining the crew in their seats, and then ejecting them ballistically into the airstream by means of a rocket thrust. After ejection, a drogue chute would initiate the opening of a 28-foot parachute to enable the crewmen to descend safely to the ground.
 
 
 5
 On March 5, 1974, Navy Lieutenant Frank Carson was killed during a daytime training mission when the RA-5C aircraft he piloted caught fire and he was forced to eject from the aircraft. Navy Lieutenant Commander Malcolm McKay was killed on August 13, 1974, after ejecting from a burning RA-5C aircraft during a night training mission. Autopsies of the two pilots revealed that their deaths were probably caused by injuries sustained during ejection.
 
 
 6
 Plaintiffs filed civil actions in the United States District Court for the Central District of California, seeking recovery of damages for the death of plaintiffs' decedents under theories of negligence, breach of warranty, and wrongful death.
 
 
 7
 The cases were consolidated for trial and, after an evidentiary hearing, the district court determined that it had admiralty jurisdiction over the actions pursuant to the Death on the High Seas Act, 46 U.S.C. Secs. 761-767.[1] The district court found that Rockwell properly was liable for the design of the HS-1A escape system under the principles of tort law set forth in sections 388, 389, and 402A of the Second Restatement of Torts. The court declined to impose liability under these principles for the design of the RA-5C aircraft. It entered judgment after a trial on the merits in favor of plaintiff Carson for $385,703.00 and in favor of plaintiff McKay for $325,850.00. Carson and McKay seek review of the measure and amount of damages awarded in their respective judgments. Rockwell also appeals, contending that military suppliers should not be liable to servicemen for injuries caused by defects in military hardware.[2] Our disposition of Rockwell's appeal makes it unnecessary to address the appeals of Carson and McKay.
 
 II.
 
 8
 LIABILITY UNDER SECTION 402A OF THE SECOND RESTATEMENT OF TORTS
 
 
 9
 The district court, as stated above, held that Rockwell was liable under section 402A of the Second Restatement of Torts for defects in the design of the HS-1A escape system.[3] We applied the principles of this section in admiralty in Pan-Alaska Fisheries, Inc. v. Marine Construction & Design Co., 565 F.2d 1129 (9th Cir.1978). But in Pan-Alaska we did not hold that strict liability applies for all purposes and for all defendants.[4] Section 402A is not a federal statute. It should be applied only when the purposes it seeks to serve dictate its application. When that is not the case it has no independent force. To apply it merely because it is there is to abdicate judicial responsibility.
 
 
 10
 Mindful of this responsibility, we conclude that only under the limited circumstances we shall enumerate below should a manufacturer be held strictly liable in tort for injuries to a serviceman on active duty caused by design defects in military equipment.A. Feres-Stencel Doctrine
 
 
 11
 We commence our analysis with Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). In that case the Supreme Court held that the United States is not subject to liability under the Federal Tort Claims Act, 28 U.S.C. Sec. 2674, to a member of the armed forces who sustains an injury while on active duty. The scope of governmental immunity was broadened recently in Stencel Aero Engineering Corp. v. United States, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977). There, the Court held that the Federal Tort Claims Act precludes the United States from indemnifying a third party for damages paid by it to a member of the armed forces who is injured during military service. The Stencel Court explained that allowing indemnity would subject the United States to varying degrees of liability, depending on the situs of the accident, would require the United States to pay indirectly to the serviceman what the Veterans' Benefits Act forbids it to pay directly, and would interfere with military discipline. Id. at 672-73, 97 S.Ct. at 2058-59.
 
 
 12
 Thus, under the circumstances of these cases, the United States would be immune both from direct tort liability as well as from the obligation of indemnifying Rockwell for damages it might be required to pay.
 
 B. Government Contractor Defense
 
 13
 Given the immunities of the United States in cases such as these, the question arises whether a supplier of military equipment should be required to shoulder directly and immediately the entire burden of the liability to an injured serviceman. Some courts, when confronted with this issue, have relied on the so-called government contractor defense.[5] This rule, first articulated by the Supreme Court in Yearsley v. W.A. Ross Construction Co., 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940), protects a government contractor from liability for acts done by him while complying with government specifications during execution of performance of a contract with the United States. See Myers v. United States, 323 F.2d 580, 583 (9th Cir.1963). The rule has been applied when the United States is immune from suit. Dolphin Gardens, Inc. v. United States, 243 F.Supp. 824, 827 (D.Conn.1965).
 
 
 14
 While the government contractor defense covered at first only construction projects, it has recently been applied by several courts to military equipment design defect cases.[6] See Note, 23 B.C.L.Rev. 1025, 1055-64 (1982). For example, in Sanner v. Ford Motor Co., 144 N.J.Super. 1, 364 A.2d 43 (1976), aff'd, 154 N.J.Super. 407, 381 A.2d 805 (1977), cert. denied, 75 N.J. 616, 384 A.2d 846 (1978), the court held that when a manufacturer produces a jeep in compliance with government specifications, the manufacturer cannot be held strictly liable for defects in the government's design specifications. Similarly, in Casabianca v. Casabianca, 104 Misc.2d 348, 428 N.Y.S.2d 400 (1980), the manufacturer of kitchen equipment made for the Army and in accordance with Army specifications was held not to be subject to liability for defects in the equipment. Finally, in In Re Agent Orange Product Liability Litigation, 534 F.Supp. 1046 (E.D.N.Y.1982), the court approved a government contractor defense for manufacturers of a chemical defoliant where the government set or ratified performance specifications for a product, the manufacturer met those specifications, and warned the government of known dangers from using the product. Id. at 1055. See also Littlehale v. E.I. DuPont de Nemours & Co., 268 F.Supp. 791 (S.D.N.Y.1966), aff'd, 380 F.2d 274 (2d Cir.1967) (no duty to print warnings on blasting caps where not required by Navy specifications).
 
 
 15
 The reasons for applying the government contractor defense to suppliers of military equipment with design defects approved by the government parallel those supporting the Feres-Stencel doctrine. First, the Supreme Court emphasized in Stencel that the United States cannot be directly or indirectly liable to servicemen injured by defective military products.[7] But holding the supplier liable in government contractor cases without regard to the extent of government involvement in fixing the product's design and specifications would subvert the Feres-Stencel rule since military suppliers, despite the government's immunity, would pass the cost of accidents off to the United States through cost overrun provisions in equipment contracts, through reflecting the price of liability insurance in the contracts, or through higher prices in later equipment sales. See In Re Agent Orange Product Liability Litigation, 506 F.Supp. 762, 793-94 (E.D.N.Y.1980), rev'd on other grounds, 635 F.2d 987 (2d Cir.1980); Dolphin Gardens, Inc. v. United States, 243 F.Supp. 824, 827 (D.Conn.1965); Note, 55 N.Y.U.L.Rev. 601, 618 (1980). As the Court explained in Stencel:
 
 
 16
 To permit [petitioner] to proceed ... here would be to judicially admit at the back door that which has been legislatively turned away at the front door. We do not believe that the [Federal Tort Claims] Act permits such a result.
 
 
 17
 432 U.S. at 673, 97 S.Ct. at 2059 (quoting from Laird v. Nelms, 406 U.S. 797, 802, 92 S.Ct. 1899, 1902, 32 L.Ed.2d 499 (1972)).
 
 
 18
 Second, to hold military suppliers liable for defective designs where the United States set or approved the design specifications would thrust the judiciary into the making of military decisions. Although judges must decide cases arising from fields of endeavor of which they know little, their otherwise omnicompetence confronts its limits in military matters. At this point, it must be acknowledged, separation of powers becomes a proper concern. See In Re Agent Orange Product Liability Litigation, 534 F.Supp. at 1054; Montgomery v. Goodyear Tire & Rubber Co., 231 F.Supp. 447, 450 (S.D.N.Y.1964); see also Morrison v. Larsen, 446 F.2d 250, 253 (9th Cir.1971); Aero Corp. v. Department of the Navy, 493 F.Supp. 558, 567 (D.D.C.1981). Trials on design defects where government specifications are at issue would "involve second-guessing military orders, and would often require members of the Armed Services to testify in court as to each other's decisions and actions." Stencel, 431 U.S. at 673, 97 S.Ct. at 2059. These trials would raise concerns about their effect on military discipline, id., as well as on national security.[8]
 
 
 19
 Third, it should be noted that in setting specifications for military equipment, the United States is required by the exigencies of our defense effort to push technology towards its limits and thereby to incur risks beyond those that would be acceptable for ordinary consumer goods. A supplier is frequently unable to negotiate with the United States to eliminate those risks. As one court put it:
 
 
 20
 Where, as here, manufacturers claim to have been compelled by federal law to produce a weapon of war without ability to negotiate specifications, contract prices or terms, the potential for unfairly imposing liability becomes great. Without the government contract defense a manufacturer capable of producing military goods for government use would face the untenable position of choosing between severe penalties for failing to supply products necessary to conduct a war, and producing what the government requires but at a contract price that makes no provision for the need to insure against potential liability for design flaws in the government's plans.
 
 
 21
 In Re Agent Orange Product Liability Litigation, 506 F.Supp. at 794. See generally Tobak, A Case of Mistaken Liability: The Government Contractor's Liability for Injuries Incurred by Members of the Armed Forces, 13 Pub.Cont.L.J. 74 (1982); Note, 23 B.C.L.Rev. 1025 (1982).
 
 
 22
 Finally, a government contractor defense provides incentives for suppliers of military equipment to work closely with and to consult the military authorities in the development and testing of equipment. The defense therefore encourages fixing the locus of responsibility for military equipment design with more precision than is possible under a system where the government contractor rule is not allowed.
 
 
 23
 While conceding that the government contractor defense can apply to military products, plaintiffs-appellants argue that it should not apply to these cases. As they see it, the defense is only available where the specifications in the contract leave no discretion to the supplier in the formulation of the product's design. They rely on O'Keefe v. Boeing Co., 335 F.Supp. 1104 (S.D.N.Y.1971), and on Merritt, Chapman & Scott Corp. v. Guy F. Atkinson Co., 295 F.2d 14 (9th Cir.1961), to support this assertion.[9] Plaintiffs-appellants' reliance is misplaced.
 
 
 24
 In O'Keefe, the court rejected Boeing's claim that it was not liable for an alleged defect in a B-52 because of the involvement of the United States in the development of the aircraft. 335 F.Supp. at 1122-24. But the discussion of the design discretion issue in O'Keefe was dictum, since the court found that the design was not defective. Moreover, the O'Keefe dictum is not compatible with the later Stencel holding.
 
 
 25
 Notwithstanding its insistence that "compulsion" is an essential element of the government contractor defense, Merritt, Chapman is distinguishable. It held that a subcontractor who built a faulty cofferdam in a dam project can be held liable for damage caused by the collapse of the cofferdam. The government contractor claim was rejected because the contract with the United States left the design, materials, and method of construction entirely to the discretion of the subcontractor. The United States merely set the height requirement for the cofferdam. Id. at 15-16.
 
 
 26
 Under these circumstances, Merritt, Chapman properly precludes the government contractor rule. When only minimal or very general requirements are set for the contractor by the United States the rule is inapplicable. The situation is different where the United States reviewed and approved a detailed set of specifications. This is precisely what may have happened in the present cases. See R.T. at 1303-04, 1309-10, 1486-87.
 
 
 27
 It is at this point that the Feres-Stencel doctrine comes sharply into focus. The United States has limited its liability to service personnel injured while on active duty. It is consistent with this limitation to construe the government contractor rule so as to avoid imposing on the contractor liability properly attributable to acts of government: The narrower the scope of this rule the greater the extent of this "misplaced" liability. While to narrow the rule aids members of the armed services and their dependents, it also imposes indirectly burdens on taxpayers and/or inflation bearers which the Feres-Stencel doctrine precludes. It follows that the scope of the government contractor rule, when applied in cases involving military personnel, should be drawn somewhat more broadly than the dictum in Merritt, Chapman might suggest.
 
 
 28
 To summarize, we hold that under the Feres-Stencel doctrine and the government contractor rule, a supplier of military equipment is not subject to section 402A liability for a design defect where: (1) the United States is immune from liability under Feres and Stencel, (2) the supplier proves that the United States established, or approved, reasonably precise specifications for the allegedly defective military equipment, (3) the equipment conformed to those specifications, and (4) the supplier warned the United States about patent errors in the government's specifications or about dangers involved in the use of the equipment that were known to the supplier but not to the United States. The imposition of this duty to warn of known defects is necessary to enable the United States to balance the risks and benefits inherent in the use of the equipment. Cf. In Re Agent Orange Product Liability Litigation, 534 F.Supp. at 1055; Note, 23 B.C.L.Rev. at 1074-85.
 
 
 29
 We recognize that the term "military equipment" is somewhat imprecise, and that at some point lines will have to be drawn. We need not do so here. The line, however, lies somewhere between an ordinary consumer product purchased by the armed forces--a can of beans, for example--and the escape system of a Navy RA-5C reconnaissance aircraft. The latter falls within the term while the former does not.
 
 
 30
 We also note that the rule enunciated here does not relieve suppliers of military equipment of liability for defects in the manufacture of that equipment. To hold otherwise would remove the incentive from manufacturers to use all cost-justified means to conform to government specifications in the manufacture of military equipment.
 
 
 31
 C. Policy Considerations in the Imposition of Strict Liability
 
 
 32
 The reasons for imposing strict liability as set forth in section 402A are inapplicable when the elements of our holding exist. See Note, 23 B.C.L.Rev. at 1080-85. Courts and commentators have identified four principal reasons for imposing strict liability on an accident producing activity--enterprise liability, market deterrence, compensation, and implied representation of safety.[10] See Note, 33 Stan.L.Rev. 535, 536 & n. 7 (1981). We shall consider each.
 
 1. Enterprise Liability
 
 33
 Under the enterprise liability rationale, when a product's price reflects the cost of accidents caused by the use of the product, that price will rise. Increased prices will then discourage consumers from purchasing risky products, and thereby lower accident costs to society. See Klemme, The Enterprise Liability Theory of Torts, 47 U.Colo.L.Rev. 153, 158 (1976). Cf. Pan-Alaska Fisheries, 565 F.2d at 1135.
 
 
 34
 However, the rationale rests on two assumptions. These are that consumers underestimate the risks involved in a product's use, and will therefore overconsume the product unless the product's price reflects the cost of accidents, and that demand for a product is elastic--that is, that it will decrease as the product's price rises. Note, 33 Stan.L.Rev. at 537 & n. 8.
 
 
 35
 Neither of these assumptions applies in the usual case to sales of military equipment to the government. First, the armed forces are aware of most, although sometimes not all, the risks involved in using military equipment. They undertake a constant program of testing and evaluating such equipment. Higher prices would not affect significantly their awareness of the safety risks involved in the use of the equipment. In addition, within broad limits demand is not elastic for military equipment. Rather, government purchases of military equipment are planned in advance, and are based on considerations of military and political strategy, as well as on the government's assessment of the risks and benefits involved in the use of the equipment. Thus, including the cost of accidents in the price of sales to the military would probably have little or no effect on product sales. Meeting adequately the needs of national defense, not accident costs, is the ultimate standard by which purchases of military equipment must be measured.
 
 2. Market Deterrence
 
 36
 A second reason for imposing strict liability is to deter manufacturers from marketing unsafe products by encouraging the use of cost-justified safety features. See W. Prosser, The Law of Torts Sec. 4, at 23 (4th ed. 1971). The safer the product, the argument runs, the lower the cost of accidents. This should reduce the product's price which, in turn, should increase the sales of the product.
 
 
 37
 But in the case of military equipment, as noted above, the demand for such equipment is quite inelastic. Moreover, the government, the sole purchaser of most military equipment, has both the ability to recognize safety problems in military equipment and to negotiate with suppliers to remedy those problems. It constantly balances the safety of the article against the imperatives of national defense. Strict liability would no doubt increase defense costs but would do little not already being done to increase the use of safety features in military equipment. See In Re Agent Orange Product Liability Litigation, 506 F.Supp. at 793. Increased defense costs, on the other hand, will diminish either other expenditures, public or private, or the level of national defense, if the level of total expenditures for that purpose were to be held constant.
 
 3. Compensation
 
 38
 A third justification for strict liability is that it provides compensation for victims of accidents caused by defective products. Restatement (Second) of Torts Sec. 402A, comment c. In the case of injured military personnel, however, the Veterans' Benefits Act provides what the Supreme Court called "a generous military compensation scheme," and "a swift, efficient remedy." Stencel, 431 U.S. at 672-73, 97 S.Ct. at 2058-59.[11] Thus, the serviceman or his family will not go uncompensated, unlike the case of an ordinary consumer injured by a defective product. It is true, of course, that strict liability would increase that compensation, but it can hardly be said that any such increase was anticipated at the time of enlistment.
 
 4. Implied Representation
 
 39
 Finally, it has been reasoned that by marketing a product, a supplier makes an implied representation that the product, if put to its intended use, will not be unreasonably dangerous and will meet the safety standard expected of similar products. If the product proves to be defective, consumers should receive compensation for the disappointment of their reasonable expectations of safety. Note, 33 Stan.L.Rev. at 544; Restatement (Second) of Torts Sec. 402A, comment i.
 
 
 40
 Members of the armed forces are not ordinary consumers with respect to military equipment. Their "reasonable expectations of safety" are much lower than those of ordinary consumers. They recognize when they join the armed forces that they may be exposed to grave risks of danger, such as having to bail out of a disabled aircraft. This is part of the job. The Nation sometimes demands their very lives. This is an immutable feature of their calling. To regard them as ordinary consumers would demean and dishonor the high station in public esteem to which, because of their exposure to danger, they are justly entitled.
 
 
 41
 D. Application of Our Holding to the Facts of These Cases
 
 
 42
 The application of our holding to the facts of these cases requires that we reverse and remand the judgments below. It is clear, and we so hold, that in these cases the United States is immune from liability for the design of the HS-1A ejection system under Feres and Stencel. Moreover, the district court held that the defect in the system was its design, not its failure to conform to government specifications. Finally, there is no allegation that Rockwell failed to warn the United States of dangers known to Rockwell but not to the Navy.
 
 
 43
 The present record, however, does not permit us to say with assurance that the United States set or approved reasonably detailed specifications for the HS-1A system. On the one hand, Rockwell alleges that the United States was deeply involved in the process of designing and approving the system. On the other hand, plaintiffs-appellants contend that the United States did little more than send Rockwell a letter asking them to come up with a new ejection system and agree to purchase Rockwell's completed design.[12]
 
 
 44
 We remand these cases to the district court to determine whether the United States set or approved reasonably detailed specifications for the HS-1A ejection system. If the district court finds that the involvement of the United States was limited in the manner the plaintiffs-appellants assert--that is, if the United States neither set specifications for the system (other than general outlines of what type of system it required) nor approved Rockwell's final reasonably detailed specifications (by examining and agreeing to a detailed description of the workings of the system)--then Rockwell is subject to strict liability under the rule set forth in section 402A. We note that Rockwell, the supplier, has the burden of proving by a preponderance of the evidence that the United States established, or approved, reasonably precise specifications for the ejection system.
 
 III.
 
 45
 LIABILITY UNDER SECTIONS 388 AND 389 OF THE SECOND
 
 RESTATEMENT OF TORTS
 
 46
 The district court also found that Rockwell was liable under Restatement (Second) of Torts Secs. 388 and 389 for breach of a duty to "test, measure or evaluate the dynamics of the ejection process on the head, helmet, and neck of the ejecting crewman," and to withdraw the HS-1A system after "continued use [showed] ... that a pattern of neck injuries was developing." We reverse.
 
 
 47
 We commence by observing that this court has not yet adopted sections 388 and 389 as a basis for liability in admiralty in this circuit. But even if we had, these sections would not support the district court's holding. First, many of the arguments discussed in Part II apply with equal force here. For example, the high incidence of government evaluation of the safety of military equipment places it in a position quite different from that of an ordinary purchaser or consumer. Also the socio-economic justifications for strict liability, as set forth above in Part II-C, continue to be inapposite when liability under these sections is considered. In addition, as explained below, the requirements for liability under sections 388 and 389 have not been met.
 
 A. Section 388
 
 48
 Under section 388, a supplier of a "dangerous chattel" is liable to those whom the supplier should expect to use the chattel if (1) the supplier knows or has reason to know that the chattel is or is likely to be dangerous; and (2) it has no reason to believe that users will realize the danger; and (3) it fails to warn the users of the chattel's dangerous condition.[13] All three criteria must be satisfied for liability to attach under section 388. Dougherty v. Hooker Chemical Corp., 540 F.2d 174, 178 (3d Cir.1976). Here both the second and third requirements for liability are lacking.
 
 
 49
 The Navy, the principal user of the HS-1A system, was aware of any injuries incurred while using the system. It "realized the danger"; it was engaged in a continuous process of evaluating the system, and of exchanging information on its performance with Rockwell. See, e.g., R.T. at 1342-44. Thus, there was no reason for Rockwell to believe that the Navy was unaware of problems with the HS-1A system, and Rockwell therefore had no duty to warn the Navy about the system's "dangerous condition."[14] See section 388, comment k; see also Strong v. E.I. DuPont de Nemours Co., 667 F.2d 682, 687 (8th Cir.1981).
 
 
 50
 In reaching its conclusion the district court relied on the following assumptions: Rockwell had a duty to test the HS-1A system; Rockwell failed adequately to test the system; testing would have revealed that the system was dangerous; Rockwell would then have been obliged to warn the Navy about these dangers and to withdraw the system from the market; and warning and withdrawal would have prevented the accidents. These assumptions are flawed.
 
 
 51
 First, it is questionable whether section 388 imposes a duty on a supplier to test a product for latent defects. See Lockett v. General Electric Company, 376 F.Supp. 1201, 1208 (E.D.Pa.1974), aff'd mem., 511 F.2d 1393 (3d Cir.1975); see also Sears, Roebuck & Co. v. Marhenke, 121 F.2d 598, 600 (9th Cir.1941). To impose on Rockwell a duty to test for latent defects would cause it to become a virtual guarantor of the proper performance by the Navy of its duties. And neither the text nor the comments to section 388 indicate that there is a duty under that section on the part of a supplier to withdraw a product from the hands of the user, particularly when that user is the Navy of the United States.
 
 
 52
 Second, even if there were such duties, the record does not show that breach of the duties proximately caused the injuries at issue in this case. There is no evidence that the Navy would have removed the system from its existing RA-5C aircraft had the Navy been aware of the possibility of the type of accident with which we are concerned. Indeed, the Navy evaluated the system subsequent to the accidents and found, on balance, that it was "safe-for-flight." Exhibit 112 (United States Navy, A-4, A-5, & A-6 Aircraft Escape System Neck Injury Investigation, Nov. 12, 1974), at p 13. Moreover, a warning directly to crews of the RA-5C aircraft, assuming that they are the "users" of whom section 388 speaks, would not have prevented the accidents here, since the crews had no choice but to fly aircraft equipped with the HS-1A system. Under these circumstances the pilots had no alternative to using the system in the case of a midair accident.[15]
 
 B. Section 389
 
 53
 Section 389 provides plaintiffs-appellants no better support. Under it, a supplier of a chattel who has informed the person to whom the chattel has been supplied of its dangerous propensities may be held liable to persons who are ignorant of the dangerous character of the chattel if the supplier is aware that the chattel is unlikely to be made reasonably safe before being put to its expected use.[16]
 
 
 54
 One difficulty in applying section 389 to the facts of these cases is that it presupposes that use by the Navy of the chattel, as supplied by Rockwell, was improper. This we cannot say without assuming the role of naval officers. As we pointed out above, the Navy evaluated the system after the accidents at issue here and continued its use. Section 389 also presupposes that the pilots, the "persons who are ignorant of the dangerous character of the chattel," would not fly if they knew the "dangerous character" of the "chattel." This cannot be assumed. Naval pilots are required to fly as ordered. The alternative to ejection following an accident usually will be death.[17] Finally, section 389 only applies when a chattel is not "reasonably safe." But, to repeat, the Navy's post-accident study found that the HS-1A system was reasonably safe. It is not for us to interfere in the Navy's evaluation of its own weapons systems. See Aero Corp. v. Department of the Navy, 493 F.Supp. 558, 567 (D.D.C.1981).
 
 
 55
 Military personnel frequently have been sent to their deaths by the incompetence of others. Hardly a page of history lacks an example or two. We do not suggest that is the case here. However, should it be so those who serve the United States in an active military capacity are assured their survivors will receive some compensation. We merely hold that it is not for this court to increase that compensation in the manner plaintiffs-appellants suggest.
 
 
 56
 The judgment of the district court is reversed and these cases remanded for proceedings consistent with this opinion.
 
 
 57
 These holdings, to repeat, make it unnecessary for us to consider the appeals by the plaintiffs-appellants.
 
 
 58
 REVERSED and REMANDED.
 
 
 59
 ALARCON, Circuit Judge, dissenting.
 
 
 60
 I respectfully dissent. Neither the Feres-Stencel doctrine nor the government contractor defense protects Rockwell from liability in this case. As demonstrated by the discussion below, a remand on this issue is unnecessary and the district court's finding of liability should be affirmed. To the extent that the damage awards have been reduced for failure to apply the collateral source rule, the decision should be reversed and the original amounts awarded.
 
 
 61
 Finally, the failure to grant prejudgment interest or damages for loss of services is discussed and instructions for the consideration of these issues on remand are given.
 
 FERES-STENCEL
 
 62
 The majority's reliance on these opinions for authority in this context is misplaced. Neither opinion addresses, limits, nor precludes contractor liability to military personnel who are injured while using defectively designed and unsafe equipment.
 
 
 63
 The Feres case involved a claim brought by a serviceman's widow under the Federal Tort Claims Act (hereinafter the FTCA). She alleged that her husband's death resulted from the negligence of his commanding officers.
 
 
 64
 In affirming the district court's dismissal of the action, the Supreme Court noted that the purpose of the FTCA was to "waive immunity from recognized causes of action, not to visit the government with novel and unprecedented liabilities." Feres, 340 U.S. at 142, 71 S.Ct. at 157. Because no American law had ever "permitted a soldier to recover for negligence, against either his superior officers or the Government he is serving," id., the Court concluded that the widow's claim was outside the waiver of immunity contemplated by the FTCA.
 
 
 65
 In Stencel, a serviceman brought suit against both Stencel Aero Engineering Corp. (hereinafter "Stencel"), the supplier of the ejection seat in which he was injured, and the United States. The serviceman claimed that his injury was the result of the defendants' individual and joint negligence. Stencel then cross-claimed against the Government for indemnification of any liability it might suffer as a result of the serviceman's claim. The Government, in response, moved for dismissal of both the tort and the cross-claim citing Feres for authority. The motion was granted and the Supreme Court affirmed.
 
 
 66
 The Court agreed that Feres controlled and limited the government's liability to the amounts provided in the statutory benefit packages. Because Stencel's indemnification claim would have pushed the government's liability above this upper limit, it also was prohibited. To hold otherwise, the Court concluded, "would be to judicially admit at the back door that which has been legislatively turned away at the front door. We do not believe that the [Federal Tort Claims] Act permits such a result." Stencel, 431 U.S. at 673, 97 S.Ct. at 2059 (quoting Laird v. Nelms, 406 U.S. 797, 802, 92 S.Ct. 1899, 1902, 32 L.Ed.2d 499 (1972)).[1]
 
 
 67
 It is apparent from a reading of these opinions that the Feres-Stencel doctrine is concerned exclusively with government, not contractor, liability. As stated in In re Agent Orange Product Liability Litigation, 506 F.Supp. 762 (E.D.N.Y.1980) reh. den., 534 F.Supp. 1046 (E.D.N.Y.1982) (hereinafter, "Agent Orange"), "[t]o the extent that plaintiff's complaints seek recovery against the defendant chemical companies, of course, the Feres doctrine has no application." Id. at 772 (emphasis added); see also 1 Jayson, Handling Federal Tort Claims Sec. 155.02 at 5-66 n. 9 and 5077 n. 24.
 
 
 68
 In this case, Mrs. McKay and Mrs. Carson have filed neither a direct claim nor a claim of indemnification against the Government. As such, their claims reside outside the previously defined area of concern expressed in Feres-Stencel and Agent Orange.
 
 
 69
 More significant than the doctrine's failure to preclude Rockwell's liability, however, is the Stencel opinion's implied recognition that a cause of action against a military contractor is proper. The Court states in footnote eight that prohibiting indemnification of Stencel is not unfair because it "no doubt had sufficient notice so as to take this risk [i.e., being held liable without indemnification by the Government] into account in negotiating its contract for the emergency eject system at issue here." Stencel, 431 U.S. at 674, 97 S.Ct. at 2059. This statement implies (1) the Court was aware of Stencel's liability for the ejection seat and declined to restrict or preclude it,[2] and (2) the Court recognized that contractors like Stencel are aware of their possible liability in this context and have already set their bid prices to reflect this risk. Here too, the Court declined to restrict or preclude this practice. Consequently, limiting the risk which supports this added cost, as the majority has done, merely results in a windfall to suppliers like Rockwell and Stencel who have existing contracts.
 
 
 70
 Under the majority's analysis, however, such a result is not discussed. To the contrary, it is assumed that current military contracts do not contain this type of compensation. Rather, the majority fears that contractors will, if held liable for unsafe designs, begin passing these liability costs on to the Government. This will be achieved, the majority suggests, through later sales and cost overrun provisions.[3] Such contractual indemnification, the majority concludes is (1) precluded by the Feres-Stencel doctrine, and (2) going to significantly increase the costs of military equipment. Neither conclusion is correct.
 
 
 71
 With regard to the first conclusion, it is simply not supported by the opinions themselves. The Feres opinion does not even mention the issue, and footnote eight of the Stencel opinion recognizes that most military equipment contracts already reflect this cost to some extent. The Stencel opinion's failure to condemn this practice reflects the Court's appreciation for the realities which control in a free market system. If contractors are subject to products liability, then that factor will be reflected in their overall cost of doing business. This cost, of course, will ultimately dictate the price charged to customers.
 
 
 72
 There is, however, no reason to believe that these costs are common, in amount and frequency, between all military equipment suppliers. Those with proven safety records may be able to secure liability insurance at much lower rates than less careful suppliers. Presumably, such cost savings enable these manufacturers to make lower bid prices and be more competitive. Because the Military is free to pursue and accept these lower bids, they help sharpen competition and keep the overall cost of bids down. Those manufacturers who do suffer liability, because of unsafe equipment, will be unable to pass on these costs freely due to the lower bids of their safer competitors. This analysis also demonstrates the error in the majority's second conclusion, i.e., products liability in this context will translate into significantly higher equipment costs to the Military.
 
 
 73
 While there is no doubt that some of these liability costs will find their way into overall bid costs, this is to a certain extent inevitable. The free market system, however, insures that this cost transfer will be minimized. Just as some manufacturers are better at minimizing the cost of overhead, others will be better at producing safe designs and avoiding liability. Bid price competition and the cost of liability provide incentives to minimize both. Footnote eight of the Stencel opinion concedes this system's existence and recognizes that one way or another, all costs incident to manufacture get passed on to the customer, whether or not it is the Government. As long as our economy continues as a free market system this court should refrain from denying its realities.
 
 
 74
 The above analysis, of course, does not apply to all government contractors, for not all of them contract at arms length with the Government. In those situations where compulsion exists, in one form or another, the contractor should be immune from suit. Public policy, however, requires that this immunity be extended only in those cases where liability will not encourage safer design or lower costs.
 
 GOVERNMENT CONTRACTOR DEFENSE
 
 75
 In its analysis of this defense, the majority has chosen to disregard the aforementioned public policy limitation. The four elements of the defense summarized in the opinion too easily allow contractors to shift responsibility for the safety of their designs on to the Government. Under the majority's four part test, any contractor who submits designs to the Military and secures approval for them is immune from unsafe design liability. This goes too far.
 
 
 76
 The Ninth Circuit has already analyzed the government contractor defense in Merritt, Chapman & Scott Corp. v. Guy F. Atkinson Co., 295 F.2d 14 (9th Cir.1961). In that case, this court held that "[i]t is elementary that compulsion must exist before the 'government contract defense' is available." Id. at 16, (emphasis in original). This compulsion requirement, however, is dismissed by the majority. Under that analysis, Merritt is found inapplicable because of the simplicity of the construction specifications involved in that case. Why the detail of the specifications should, by itself, negate the compulsion requirement, is not explained. By failing to do so, however, the majority glosses over what this circuit has recognized to be an "elementary" requirement of the defense.
 
 
 77
 The question of compulsion is fundamentally distinct from a project's complexity. A contractor can be required to make blasting caps in the exact manner provided in military specifications during time of war, see Littlehale v. E.I. du Pont de Nemours & Co., 268 F.Supp. 791, 801-802 (S.D.N.Y.1966), aff'd, 380 F.2d 274 (2d Cir.1967) or be given free reign to design a complex airplane like the B-52. See Boeing Airplane Co. v. Brown, 291 F.2d 310 (9th Cir.1961) and O'Keefe v. Boeing Company, 335 F.Supp. 1104 (S.D.N.Y.1971). Merritt recognizes the distinction between these situations and endorses the extension of immunity only in those cases where behavior has been compelled.
 
 
 78
 Merritt does not stand alone in this respect. All of the cases relied on by the majority, which apply the defense, found some factor which compelled the contractor to act as they did. In Casabianca v. Casabianca, 104 Misc.2d 348, 428 N.Y.S.2d 400 (1980), the subject bakery dough mixer had been built "in or about 1942 or 1943 for the United States Army in accordance with the Army's specifications for use in field kitchens during World War II." Id. 428 N.Y.S.2d at 401. Later, after having been installed in the plaintiff's pizza parlor, the machine injured the plaintiff's son. In dismissing the son's claim against the manufacturer, the court held that "a supplier to the military in time of war has a right to rely upon such specifications [i.e. those provided by the military] ..." without fear of liability. Id. 428 N.Y.S.2d at 402. (Emphasis added). The court then expressly limited the extension of this immunity to contracts performed under "time of war" restrictions. Id.
 
 
 79
 The approval of the government contractor defense in the In re Agent Orange Products Liability Litigation, 506 F.Supp. 762 (E.D.N.Y.1980), reh. den., 534 F.Supp. 1046 (E.D.N.Y.1982) opinion, also involved manufacturers who alleged that they were compelled during "time of war" to produce supplies according to specifications developed and provided by the Military. 506 F.Supp. at 794-95.[4] Although that case has yet to come to trial, the court established the elements of the government contractor defense which the chemical companys must prove. There, the court stated, that "one of the elements of the defense is that the product in issue be one for which the government established the design and specific characteristics." 534 F.Supp. at 1056. Furthermore, "if it should appear that the contract set forth merely a 'performance specification', as opposed to a specified product, then the government contract defense would be far more restricted than as described here." Id. It is clear from these statements that the Agent Orange court recognizes and requires control or compulsion as an element of the defense.
 
 
 80
 In Sanner v. Ford Motor Co., 144 N.J.Supp. 1, 364 A.2d 43, aff'd, 154 N.J.Super. 407, 381 A.2d 805 (1977), cert. denied, 75 N.J. 616, 384 A.2d 846 (1978) another form of compulsion was presented. There, the contractor merely built a vehicle according to plans and specifications provided to it by the Military. The court found that "defendant had no discretion with respect to the installation of seatbelts and since it strictly adhered to the plans and specifications owned and provided by the government, Ford is protected from liability." Id. 381 A.2d at 806 (emphasis added).
 
 
 81
 Each of these cases demonstrates, in one way or another, the compulsive nature of the Government's behavior or direction when its contractor is immune. Only then will the contractor's behavior be the result of governmental discretion and direction. Consequently, only then should the contractor share in the Government's immunity.
 
 
 82
 In this case, Rockwell has not even alleged it was compelled to produce this ejection system. Furthermore, the only specifications which Rockwell adhered to were initially produced by its own design staff. Whether the Military subsequently ratified these designs should not alter Rockwell's primary responsibility for their content and adequacy. This case is unlike Sanner or Casabianca where the contractor merely followed plans and specifications provided and developed by the Military. Rather, this matter more clearly resembles the situation described in Agent Orange where the Military merely provides "performance specifications". As such, the government contract defense should be "far more restricted" than that described by the majority. See Agent Orange, 534 F.Supp. at 1056.
 
 
 83
 More specifically, Rockwell's posture reflects that of Boeing, in Boeing Airplane Company v. Brown, 291 F.2d 310 (9th Cir.1961) (hereinafter Brown ) and O'Keefe v. Boeing Company, 335 F.Supp. 1104 (S.D.N.Y.1971) (hereinafter O'Keefe ). In O'Keefe, Boeing was sued for negligent design of the tail support structure in the B-52 bomber. In response, Boeing argued the government contractor defense. The court then conceded that "ultimate responsibility for the design and use of the B-52 bomber rests and has always rested with the United States government." 335 F.Supp. at 1124. Nevertheless, the court went on to say that "this fact, in itself, neither exonerates the defendant, nor has it in any way altered the defendant's duty as a manufacturer in this case where there has been no showing that the defendant was totally oblivious of and/or aloof from the genesis of the design specifications ..." Id.
 
 
 84
 The majority discusses this conclusion but dismisses it as dictum.[5] Nevertheless, it is based on the holding in Brown. There, a defectively designed alternator disintegrated and caused the B-52 in which it was installed to crash. In this case Boeing also attempted to avoid liability by shifting primary responsibility for the defect on to the Government. They argued, according to the court, that:
 
 
 85
 the Air Force was negligent in its entire course of conduct in approving the design for the alternator drive prior to manufacture, supervising its manufacture, monitoring the qualification and production testing, and accepting the completed aircraft. Appellant predicates this view on the assumption, for the purpose of argument, that the design of the alternator drive was defective. If the design was defective, it is contended, the Air Force, in view of its continual contact with the project, was negligent in its failure to discover the defect and require its correction.
 
 
 86
 291 F.2d at 316-17. Although Boeing did not specifically label this argument "the government contractor defense", clearly its content demonstrates its essential similarity to that defense.
 
 
 87
 The Ninth Circuit, however, was no more impressed with the argument at that time than it should be now. The court recognized that inspection and approval do not constitute direction or compulsion. Therefore, Boeing was responsible for its own actions and design decisions despite the Government's approval.[6] As long as Boeing continued as the source or genesis of the design, the negligence of that design remained its own responsibility.
 
 
 88
 The majority, however, does not even address this earlier decision by the Ninth Circuit. Instead, it is dismissed in footnote six, ante, as being a case which fails to discuss the contractor issue. The above excerpt demonstrates that this is not the case. Furthermore, the two Boeing cases are significant in that they are nearly identical to the case at bar. All three involve contractors who supplied negligently designed complex weapons systems which were approved and tested by the Military. In each, the courts held that responsibility for the designs remained with the manufacturer despite military approval. Furthermore, unlike the other cases which involved supply contracts entered into either during time of war or pursuant to government supplied plans and specifications, these cases involved contracts made pursuant to "performance specifications". The above mentioned similarities and distinctions demonstrate that Brown and O'Keefe rather than Sanner and Casabianca should control here.
 
 
 89
 The majority is also concerned about possible deleterious effects this type of contractor liability would have on military discipline. Although the Stencel opinion expressed some concern for that issue, Justice Marshall's dissent in that case clearly demonstrated its boundaries. He recognized that a contractor, sued by a civilian, might "cross claim against the Government. In that hypothetical case, ... there would be the same chance that the trial would 'involve second guessing military orders, and would ... require members of the Armed Services to testify in court as to each other's decisions and actions'. Ante at 673 [97 S.Ct. at 2059]. Yet, there would be no basis, in Feres or in the Tort Claims Act, for concluding that the suit is barred because of the nature of the evidence to be produced at trial." Stencel, 431 U.S. at 676-77, 97 S.Ct. at 2060 (Marshall, dissenting). Clearly then, if Marshall's hypothetical suit is not blocked by discipline concerns, then the far more attenuated suit at issue here is also unblocked by this concern.
 
 
 90
 Finally, the majority suggests that to treat military personnel "as ordinary consumers would demean and dishonor the high station in public esteem to which, because of their exposure to danger, they are justly entitled." Ante at 453. While all can agree that military personnel are entitled to the high honor and esteem in which they are held, I take issue with the majority's description of its source.
 
 
 91
 Military personnel are honored and esteemed because they are willing to fight for their country and risk their lives doing so. They are not so respected because they are sometimes forced by their calling to use unsatisfactory or unsafe equipment. It is the Military's, Rockwell's and this court's duty to insure that our servicemen are provided with reliable and safe equipment. Just as the Military can make any parachute packer take one that he has just folded and make him jump with it, the court should require that Rockwell stand behind the products for which it voluntarily contracts and provides at a profit. To extend the contractor defense in the way the majority suggests will only result in more unsafe and unreliable equipment. To do so would unnecessarily increase the danger which our military personnel face so patriotically.[7]
 
 THE REMAND
 
 92
 Applying the holdings and reasoning of O'Keefe, Brown, Merritt and Agent Orange to the instant case demonstrates that a remand on the issue of liability is unnecessary. As mentioned earlier, although Rockwell raised the government contractor defense in a motion for summary judgment, it failed to put on evidence in support of that defense at trial. Rockwell does not point to any testimony or evidence in the record which shows that it was compelled by the Military to build the ejection system in a particular manner.[8] On the other hand, the district court opinion is replete with references which demonstrate that the trial judge found Rockwell, not the Military, to be the designer of the ejection system.[9] Furthermore, Rockwell's reliance on Kropp v. Douglas Aircraft, 329 F.Supp. 447 (E.D.N.Y.1971) for a description of their ejection seat design process demonstrates that they are not entitled to the defense. In Kropp, the design process was described as beginning "rather informally with an idea or suggestion which may emanate either from the manufacturer or the Government, usually the latter." Id. at 456. This description closely parallels the "performance specification" situation described in Agent Orange. There, the court held that the government contractor defense was "far more restricted." See Agent Orange, 534 F.Supp. at 1056. It also reflects Boeing's behavior in O'Keefe, where a failure to show "the defendant was totally oblivious and/or aloof from the genesis of the design specifications in the first place" precluded the defense. See O'Keefe, 335 F.Supp. at 1124. Finally, Brown shows that inspection and approval of a design by the Military does not in any way dismiss the primary responsibility of the contractor who creates the design. See Brown, 291 F.2d at 317.
 
 
 93
 The purpose of the remand, proposed by the majority, is to discover whether or not the Government set or approved "reasonably detailed specifications for the HS-1A system." Ante at 453. As shown by the discussion above, however, it is compulsion, to follow Government plans, not Government approval of contractor plans which entitles Rockwell to immunity. Even if we assume, arguendo, that a detailed set of plans created by Rockwell were submitted and then approved, the lack of compulsion would prevent the Government from assuming responsibility for the safety or adequacy of Rockwell's design. Because Rockwell has failed to prove or allege that it was compelled to produce the HS-1A system, a remand is unnecessary. Without evidence of the compulsion element, the Ninth Circuit has held and should continue to hold as a matter of law, that the defense is unavailable. See Merritt, 295 F.2d at 16. If the majority continues to insist on a remand, then, in addition to the four elements set out in the opinion, Rockwell should be required to prove, as a fifth element of the defense, that it was compelled by the Government to produce the ejection system in a manner which failed to protect the crewman's head and neck from injury.
 
 
 94
 While I believe that a remand on the liability issue is unnecessary, I do believe that other issues, not discussed by the majority, require reversal and further consideration by the district court. In the interest of judicial economy, I will discuss them at this time.
 
 THE DAMAGES ISSUE
 
 95
 The district court concluded, in both cases, that the amount of Rockwell's liability was to be reduced by the V.A. benefits each widow was receiving. The trial judge concluded that "[p]laintiffs should not be permitted to recover the 'lost' military retirement while presently collecting that retirement in the form of V.A. pension." District court opinion at 14. The conclusion is incorrect.
 
 
 96
 The Ninth Circuit has recognized the "well established rule that a tortfeasor's liability is not reduced by funds or services received by the injured person from a source collateral to the tortfeasor. The tortfeasor should not be required to compensate twice for the same injury, [see Brooks v. United States, 337 U.S. 49, 53-54, 69 S.Ct. 918, 920-921, 93 L.Ed. 1200 (1949) ] but he should not have the benefit of payments to the injured person which he did not make." Gypsum Carrier, Inc. v. Handelsman, 307 F.2d 525, 534 (9th Cir.1962). Therefore, the question before us is whether Rockwell can be considered the source of the V.A. benefits being received by Mrs. McKay and Mrs. Carson.
 
 
 97
 The benefits at issue are distributed pursuant to 38 U.S.C. Secs. 410-417 (1979) (Dependency and indemnity compensation benefits). Funds for these benefits are by Congressional appropriation and other than general payment of taxes, Rockwell makes no specific contribution to these funds. Therefore, the Government, not Rockwell, is the source of these benefits.
 
 
 98
 Rockwell contends, however, that its contractual relationship with the Government prohibits this conclusion and cites City of Salinas v. Souza & McCue Construction Co., 66 Cal.2d 217, 57 Cal.Rptr. 337, 424 P.2d 921 (1967) (hereinafter "Souza ") for support. The contention has no merit.
 
 
 99
 The Souza opinion is inapplicable to Rockwell's situation for two reasons. First, because a public-entity defendant was involved, Souza restrained application of the rule. The court reasoned that "the collateral source rule is punitive in nature (United Protective Workers v. Ford Motor Co., 223 F.2d 49, 54 (7th Cir.1955); 2 Harper & James, Law of Torts, Sec. 22.22 p. 1345; Fleming, The Collateral Source Rule and Lors Allocation in Tort Law, 54 Cal.L.Rev. 1478, 1482-1484)", and that "the levying of punitive damages against a public entity has not been authorized." Souza, 66 Cal.2d at 228, 57 Cal.Rptr. 337, 424 P.2d 921. Second, Souza involved a breach of contract action. In such cases, the recovery "is intended only to restore the injured party to the position he would have occupied in the absence of the breach." Id. at 227, 57 Cal.Rptr. 337, 424 P.2d 921. Therefore, set-offs which limit recovery to the benefit of the bargain are not objectionable. In tort cases, however, no such limitation applies. To restrain the collateral source rule in this context "would negate the deterrent effect of an award against a tortfeasor." Id. Consequently, both factors which restrained application of the collateral source rule in Souza do not apply here. Rockwell, despite its contractual relation with the Government, is not a public entity, and its liability stems from tortious conduct, not contract breach. Rockwell's other arguments in favor of set-off are equally unpersuasive.
 
 
 100
 First, Rockwell argues that the collateral source rule only applies to contributory benefits. The cases upon which Rockwell relies, however, have only applied this requirement to situations where there is a government defendant which is already paying benefits to the plaintiff.[10] The contribution requirement in these cases protects government defendants from double liability. Such protection is unnecessary in Rockwell's situation. Furthermore, Feres-Stencel insures that the Government's liability is limited to the V.A. benefits being paid.
 
 
 101
 Second, Rockwell argues that the V.A. benefits represent a payment by a tortfeasor prior to litigation and should be deducted.[11] The district court, however, did not find that the Government was negligent with respect to the ejection seat design.[12] Consequently, the Government is not a joint-tortfeasor with respect to Rockwell's present liability for unsafe design.
 
 
 102
 Rockwell's final contention is that V.A. benefits are equivalent to those provided under the Federal Employment Compensation Act and are therefore, set off under Witt v. Jackson, 57 Cal.2d 57, 73, 17 Cal.Rptr. 369, 366 P.2d 641 (1961). The holding in Witt, however, was limited to California workmen's compensation benefits and only applies when the employer is a concurrent tortfeasor. See De Cruz v. Reid, 69 Cal.2d 217, 222-23, 70 Cal.Rptr. 550, 444 P.2d 342 (1968); Arbaugh v. Procter & Gamble Mfg. Co., 80 Cal.App.3d 500, 145 Cal.Rptr. 608 (1978). As has been discussed earlier, the district court did not find the Government to be a concurrent tortfeasor with respect to the ejection seat design. Therefore, Witt does not apply and it is unnecessary to decide whether or not V.A. benefits are equivalent to workmen's compensation.
 
 
 103
 In sum, Gypsum Carrier, supra, states the general rule in this circuit. Despite Rockwell's arguments, there is no reason why it should not be applied in this case. The V.A. benefits presently being paid to Mrs. Carson and Mrs. McKay stem from a source "wholly independent" of Rockwell. As such, they are a collateral source, and the district court erred in concluding otherwise. The district court ruling on this issue should be reversed and the original sum awarded.
 
 PREJUDGMENT INTEREST
 
 104
 The damages awarded to plaintiffs do not include an amount for prejudgment interest. "In admiralty, prejudgment interest must be granted unless peculiar circumstances justify its denial;" Dillingham Shipyard v. Associated Insulation Co., 649 F.2d 1322, 1328 (9th Cir.1981). "The determination of whether peculiar circumstances exist warranting the denial of prejudgment interest is left to the sound discretion of the trial court." Edinburgh Assur. Co. v. R.L. Burns Corp., 669 F.2d 1259, 1263 (9th Cir.1982). Failure to articulate why prejudgment interest is not to be awarded is an abuse of discretion. Id. Under these authorities, the failure to either award plaintiffs prejudgment interest or articulate reasons for not doing so was an abuse of discretion by the district court. Upon remand, the trial judge should either "determine at what rate and from what time prejudgment interest should be awarded," Edinburgh, supra at 1263, or articulate why he has not done so.
 
 LOSS OF SERVICES
 
 105
 The damages awarded to plaintiffs did not provide for loss of services. This measure of damage is distinct from loss of society and is recoverable under DOHSA. See Mobil Oil Co. v. Higginbotham, 436 U.S. 618, 622, 98 S.Ct. 2010, reh. denied, 439 U.S. 884, 99 S.Ct. 232, 58 L.Ed.2d 200 (1978); Solomon v. Warren, 540 F.2d 777, 788-90 (5th Cir.1976), cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). (Loss of services herein called "loss of nurture".) Loss of services is compensable because it is capable of being valued. "Guidance of a parent in matters material, moral, and spiritual is of a definite practical and financial value and is subject to pecuniary estimate." Moore-McCormack Lines v. Richardson, 295 F.2d 583, 593 n. 9a (2d Cir.1961), cert. denied, 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962); Bodden v. American Offshore, Inc., 681 F.2d 319, 329 (5th Cir.1982). Consequently, it was error for the district court to grant an award which did not include an amount for loss of services or an explanation why they were excluded. On remand, the trial judge should determine whether there is a factual basis for loss of services in these cases:
 
 
 106
 Under DOHSA the wrongful death of a parent standing alone is an insufficient predicate to support recovery by a child of the loss of parental nurture, and in order to recover this item of damages the evidence must show that the deceased parent was fit to furnish such training and that training and guidance had actually been rendered by the parent during his or her lifetime to their children.
 
 
 107
 Solomon v. Warren, supra at 788; see Petition of Risdale & Anderson, Inc., 291 F.Supp. 353, 358 (D.Mass.1968) (factors to consider).
 
 
 
 *
 Honorable Charles L. Hardy, United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 Plaintiffs-appellants contend that jurisdiction should also be based on general maritime law, see Moragne v. States Marine Lines, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), which allows litigants in a wrongful death action to recover for loss of society, comfort, and care. See Sea Land Services v. Gaudet, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974). We need not address this contention since we do not reach the damages issue in this case, and, apart from damages, the relevant law is the same under general maritime law as under the Death on the High Seas Act
 
 
 [2]
 Plaintiffs-appellants claim that the district court erred by refusing to award them prejudgment interest, by misapplying the collateral source rule and thereby wrongly reducing the award of damages, and by declining to award compensation for the loss of services and society. Rockwell contends that the district court erred in its findings of fact, evidentiary rulings, and opinion format
 
 
 [3]
 Section 402A states:
 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate consumer, or to his property, if
 (a) the seller is engaged in the business of selling such a product, and
 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
 (2) The rule stated in Subsection (1) applies although
 (a) the seller has exercised all possible care in the preparation and sale of his product, and
 (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
 
 
 [4]
 Strict liability does not apply to every accident-producing activity. See, e.g., Restatement (Second) of Torts Sec. 402A, comment k (unavoidably unsafe products); La Rosa v. Superior Court, 122 Cal.App.3d 741, 176 Cal.Rptr. 224 (1981) (used products); Pena v. Sita World Travel, Inc., 88 Cal.App.3d 642, 152 Cal.Rptr. 17 (1978) (services); Silverhart v. Mount Zion Hospital, 20 Cal.App.3d 1022, 98 Cal.Rptr. 187 (1971) (sales-service hybrid)
 
 
 [5]
 Rockwell preserved its right to rely on the government contractor defense by asserting it in a motion for summary judgment
 
 
 [6]
 Most of the cases cited by plaintiffs-appellants in which a court held a manufacturer liable to a serviceman involve manufacturing, rather than design defects. See, e.g., Foster v. Day & Zimmermann, 502 F.2d 867 (5th Cir.1974); Whitaker v. Harvell-Kilgore Corp., 418 F.2d 1010 (5th Cir.1969); Montgomery v. Goodyear Tire & Rubber Co., 231 F.Supp. 447 (S.D.N.Y.1964). In other cases relied on by plaintiffs-appellants, the parties failed entirely to raise the contractor issue. See, e.g., Stencel Aero Engineering Corp. v. United States, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977); Boeing Airplane Co. v. Brown, 291 F.2d 310 (9th Cir.1961); Renner v. Rockwell International Corp., 403 F.Supp. 849 (C.D.Cal.1975), vacated, 587 F.2d 1030 (9th Cir.1978)
 
 
 [7]
 The recent decision of the Supreme Court in Lockheed Aircraft Corp. v. United States, --- U.S. ----, 103 S.Ct. 1033, 74 L.Ed.2d 911 (1983), does not detract from the Feres-Stencel doctrine's rationales
 In Lockheed, a civilian employee of the Navy was killed in a crash of a C-5A aircraft manufactured by Lockheed, and flown by the Air Force. The United States paid death benefits to the employee's survivors under the Federal Employees' Compensation Act (FECA). The survivors then sued Lockheed, and Lockheed impleaded the United States as a third party defendant for indemnification purposes. The Court held that FECA does not bar such an indemnity action against the United States.
 The Court distinguished the Feres-Stencel doctrine from Lockheed. The Court explained that while the United States had waived its immunity from an indemnity action based on an injury to a civilian employee who had been compensated under FECA, the United States still enjoyed sovereign immunity under Feres-Stencel from an indemnity action based on an injury to a serviceman. 103 S.Ct. at 1037-38 n. 8.
 
 
 [8]
 Also, allowing liability would, as the Stencel court feared, subject the United States indirectly to paying for damages to injured servicemen, where the amount of damages would vary depending on the applicable law. 431 U.S. at 672, 97 S.Ct. at 2058
 
 
 [9]
 Plaintiffs-appellants also rely on Montgomery v. Goodyear Tire & Rubber Co., 231 F.Supp. 447 (S.D.N.Y.1964). That case, as noted above, involves a manufacturing, not a design defect
 
 
 [10]
 For convenience, we subsume the most important justifications for strict liability into four categories, based on the usage of the Oregon Supreme Court. See, e.g., Tillman v. Vance Equipment Co., 286 Or. 747, 752-54, 596 P.2d 1299, 1302-03 (1979). For a fuller list of the possible rationales for strict liability, see Henderson, Extending the Boundaries of Strict Products Liability: Implications of the Theory of the Second Best, 128 U.Pa.L.Rev. 1036 (1980); Owen, Rethinking the Policies of Strict Products Liability, 33 Vand.L.Rev. 681 (1980)
 Some commentators include among the principal justifications for imposing strict liability the reduction of transaction costs by relieving the plaintiff of the problem of proving negligence or warranty violations. See, e.g., Schwartz, Forward: Understanding Products Liability, 67 Calif.L.Rev. 435, 459-60 (1979). Other authorities maintain that the burden of proving negligence is not significantly more difficult than that of strict liability. See, e.g., Sachs, Negligence or Strict Product Liability: Is There Really a Difference in Law or Economics?, 8 Ga.J. Int'l & Comp.L. 259 (1978).
 
 
 [11]
 The Veterans' Benefits Act may not provide full compensation for a loss in a situation similar to the present case. For example, veterans' benefits do not compensate for loss of companionship or services. But many of these benefits are also unavailable under the Death on the High Seas Act. Moreover, compensation under the Veterans' Benefits Act is not reduced by the high transaction costs present in ordinary products liability litigation. Stencel, 431 U.S. at 673, 97 S.Ct. at 2058. See Note, 23 B.C.L.Rev. 1025, 1083-84 (1982)
 
 
 [12]
 The district court did not make a factual finding on this issue in denying Rockwell's motion for summary judgment on the government contractor defense, R.T. at 25, or in its opinion. Plaintiffs-appellants are mistaken in their assertion to the contrary
 
 
 [13]
 Section 388. Chattel Known to be Dangerous for Intended Use
 One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.
 
 
 [14]
 It is necessary here to distinguish between the Navy, the principal user of the HS-1A system, and plaintiffs-appellants' decedents, who were "secondary users," or "ultimate consumers" of the system. In the case of section 388, a warning to the Navy would have been sufficient to relieve Rockwell of liability for injury to a Navy pilot. Section 388, comment n. Cf. Dalke v. Upjohn Co., 555 F.2d 245, 247-48 (9th Cir.1977)
 
 
 [15]
 The district court found that both aircraft were out of control, and were flying at speeds in excess of 400 knots
 
 
 [16]
 Section 389. Chattel Unlikely to be Made Safe for Use
 One who supplies directly or through a third person a chattel for another's use, knowing or having reason to know that the chattel is unlikely to be made reasonably safe before being put to a use which the supplier should expect it to be put, is subject to liability for physical harm caused by such use to those whom the supplier should expect to use the chattel or to be endangered by its probable use, and who are ignorant of the dangerous character of the chattel or whose knowledge thereof does not make them contributorily negligent, although the supplier has informed the other for whose use the chattel is supplied of its dangerous character.
 
 
 [17]
 But see Sec. 389, comment d (railroad is liable to soldier for accident caused by defective track even though soldier was ordered to take train over the track). The example in comment d is based on Bryson v. Hynes, 268 F. 290 (4th Cir.1920), a case which is not law in this circuit, and which is unlikely to be followed by modern courts, especially after the Feres and Stencel decisions
 
 
 [1]
 The use by the majority of this quotation at page 449, ante may lead to a misinterpretation or mislead others as to the Supreme Court's holding. There, the usage of the quote implies that the Stencel opinion disapproves of contractors passing on their costs through later sales and cost overrun provisions. In fact, the quoted language merely refers to indemnity suits
 
 
 [2]
 The Agent Orange opinion comports with this analysis. There the court stated that the "Feres-Stencel doctrine bars defendant's attempt to seek contribution or indemnity from the United States based on any recovery plaintiffs may obtain for injuries...." Agent Orange, 506 F.Supp. at 774. This acknowledgement that plaintiffs might recover from a military contractor within an analysis of Stencel implies that such a recovery is not barred by that opinion
 
 
 [3]
 The majority fails to explain how liability costs can be legitimately included within the ambit of a cost-overrun provision
 
 
 [4]
 It should be noted that the court in Agent Orange denied a motion for summary judgment based on these compulsion allegations. Instead, the court required defendants to prove at trial that this compulsion in fact occurred. Agent Orange, 506 F.Supp. at 795-96. See also Jenkins v. Whittaker Corp., 551 F.Supp. 110 (D.Haw.1982), where the court noted that the Agent Orange ruling "should be limited to cases involving the manufacture of 'weapons during wartime.' " Id. at 114. Also, because the atomic simulator at issue was not "designed under the urgency of wartime," the Agent Orange holding was "inapposite to the case at bar." Id
 
 
 [5]
 The majority fails to explain why the dictum in O'Keefe is less meritorious than the dictum in Agent Orange upon which it so heavily relies
 
 
 [6]
 See Jenkins v. Whittaker Corp., supra, note 4 where the court "ORDERS that Whittaker will be prohibited from arguing to the jury that Whittaker cannot be held liable for design ... because Whittaker followed the plans and specifications of the government...." 551 F.Supp. at 114-15
 
 
 [7]
 See Foster v. Day & Zimmermann, Inc., 502 F.2d 867 (8th Cir.1974), where the court stated:
 In making the grenade and its component parts the defendant knew that it was made for military personnel and that it was to be used by them. We believe the public interest in human life and health requires the protection of the law against the manufacture of defective explosives, whether they are to be used by members of the public at large or members of the public serving in our armed forces.
 Id. at 871; see also Challoner v. Day & Zimmermann, Inc., 512 F.2d 77 (5th Cir.1975).
 
 
 [8]
 See, footnote 4, supra where defendants in the Agent Orange case were required to prove, among other things that (1) the military developed and provided exact specifications for the product, and (2) that they were compelled to produce Agent Orange in this manner by the war time provisions of federal law
 
 
 [9]
 See District Court Opinion at 10 "Rockwell designed, developed, tested, and manufactured a system ... known as the FS-1 system ..." also, "the many neck injuries that had been experienced by crewmen who had activated the HS-1A and the similar preceding FS-1 escape system must have brought notice to Rockwell, as designer and manufacturer, ..." at 12. (emphasis added)
 
 
 [10]
 Rockwell relies primarily on: Helfend v. Southern Cal. Rapid Transit District, 2 Cal.3d 1, 13-14, 84 Cal.Rptr. 173, 181, 465 P.2d 61, 69 (1980); United States v. Brooks, 176 F.2d 482 (4th Cir.1949); and Overton v. United States, 619 F.2d 1299 (8th Cir.1980)
 
 
 [11]
 The rule which Rockwell relies on requires that the payments be in "settlement." See Donham v. United States, 536 F.2d 765, 775 n. 12 (8th Cir.1976), aff'd sub nom., Stencel Aero Engineering Corp. v. United States, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977). Furthermore, the Donham footnote is based on the reasoning in Murray v. United States, 405 F.2d 1361 (D.C.Cir.1968). This reasoning was rejected by the Ninth Circuit in Dodge v. Mitsui Shintaku Ginko K.K. Tokyo, 528 F.2d 669, 671-72 (9th Cir.1975), cert. denied, Mitsui Shintaku Ginko K.K. Tokyo v. Dodge, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976). There, this court noted that the Murray approach had been rejected by the Second Circuit and that it was contrary to the great weight of authority
 
 
 [12]
 There was some suggestion in the district court opinion that the Navy had been negligent in its apparent failure "to live up to its duty to vigilantly inspect, maintain, and repair these high performance airplanes." District Court Opinion at 9. With regard to the ejection seat, however, that was "quite another matter." Id. "It seems clear to the Court that the design of the escape system is all-important ... maintenance of the system is of lesser importance." Id. at 12. Finally, "the court finds that the condition of the HS-1A ejection system involved ... had not substantially changed between the time they were installed by Rockwell and the time they were deployed by decedents." Id. at 14