Joan S. TOZER, surviving widow of Eliot F. Tozer, deceased and to her own use and benefit and to the use and benefit as mother and next friend of: Katherine S. Tozer, surviving minor child of Eliot F. Tozer, deceased and; Lindsay M. Tozer, surviving minor child of Eliot F. Tozer, deceased and; Joan S. Tozer, personal representative of the estate of Eliot F. Tozer, deceased, Appellees,

v.

LTV CORPORATION, a Texas Corporation; Jones & Laughlin Industries, Inc.; Vought Corporation, a Delaware Corporation, Appellants.

Bell Helicopter Textron, Lockheed Corp., McDonnell-Douglas Corp., United Technologies Corp., Amici Curiae.

Joan S. TOZER, surviving widow of Eliot F. Tozer, deceased and to her own use and benefit and to the use and benefit as mother and next friend of: Katherine S. Tozer, surviving minor child of Eliot F. Tozer, deceased and; Lindsay M. Tozer, surviving minor child of Eliot F. Tozer, deceased and; Joan S. Tozer, personal representative of the estate of Eliot F. Tozer, deceased, Appellants,

v.

LTV CORPORATION, a Texas Corporation; Jones & Laughlin Industries, Inc.; Vought Corporation, a Delaware Corporation, Appellees.

Bell Helicopter Textron, Lockheed Corp., McDonnell-Douglas Corp., United Technologies Corp., Amici Curiae.

Nos. 84–1907(L), 84–1962.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 5, 1985.

Decided May 27, 1986.

---

Drew Pomerance (Kern & Wooley, Los Angeles, Cal., Fred J. Meier, Charles E. Iliff, Jr.; Semmes, Bowen & Semmes, Baltimore, Md., on brief), for appellants.

Michael J. Pangia (Smiley, Olson, Gilman & Pangia, Washington, D.C., Paul D. Bekman, Baltimore, Md., on brief), for appellees.

(Lewis T. Booker; L. Neal Ellis, Jr.; Hunton & Williams, Richmond, Va., on brief), for amici curiae.

Before RUSSELL, HALL and WILKINSON, Circuit Judges.

WILKINSON, Circuit Judge:

In 1980, Lieutenant Commander Eliot Tozer was killed when the Navy plane he was piloting crashed. His widow, Joan Tozer, and his two minor children brought an action against LTV Corporation and its subsidiary Vought Corporation under the Death on the High Seas Act (DOHSA) 46 U.S.C. § 761 *et seq.* and general maritime law, alleging the defective design of a modification to the airplane. The jury returned a verdict in favor of the plaintiffs. Because the government contractor defense shields the contractor from liability for design defects under either a strict liability or a negligence theory when the government has approved reasonably detailed specifications, we reverse and remand for entry of judgment in favor of the defendants.

## I.

Tozer's crash occurred off the coast of California while his plane was executing a low-altitude, high speed fly-by of its carrier, the U.S.S. Kitty Hawk. At trial, Joan Tozer contended that the plane had crashed because a panel known as the "Buick Hood" had come off in mid-flight, causing him to lose control of his Navy RF–8G Reconnaissance plane. The Buick Hood is a hinged panel that permits access to the equipment underneath so that it can be repaired and maintained; the panel should not open during flight.

When the RF–8G was first designed, it had a one-piece panel that wrapped around the top of the aircraft. In order to do maintenance or repair work in the compartment below, the whole panel had to be removed. The Navy asked Vought to modify the panel so that the systems beneath it could be more easily and quickly maintained. Vought cut the panel into three pieces, fixing the center piece to the aircraft, and hinging the two outer pieces along the center line. The non-hinged sides of the hood are fastened with "camlocs," quick fasteners which can be released by a turn of a screwdriver. Tozer contends that it is well known that camlocs often come loose, because of wear, vibration, or corro-

sion, and that usually many camlocs are installed for safety. Tozer said that Vought was negligent because it did not fasten the panel with redundant camlocs.

Vought contended the design had been carefully analyzed, tested, and found adequate. More fundamentally, Vought argued that it could not be found liable for the design of the aircraft since the Navy had approved it, and the company shared the United States' immunity through the government contractor defense. The district judge instructed the jury that the government contractor defense precluded recovery on the basis of strict liability, but did not instruct the jury on the defense with respect to negligence. The jury returned a special verdict, finding that defendants were negligent in the design of the Buick Hood modification and that the U.S. Navy had reviewed and approved reasonably detailed specifications for the Buick Hood modification. The jury awarded $350,000 to Joan Tozer, and $50,000 to each of her two daughters.

Vought contends that the district judge should have instructed the jury that the government contractor defense precludes recovery for negligence as well as strict liability. We agree that the defense applies here to prevent recovery under either theory and reverse and remand for entry of judgment notwithstanding the verdict in favor of Vought.[1]

## II.

Traditionally, the government contractor defense shielded a contractor from liability when acting under the direction and authority of the United States. *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20, 60 S.Ct. 413, 414, 84 L.Ed. 554 (1940). In its original form, the defense covered only construction projects, *McKay v. Rockwell Int'l Corp.*, 704 F.2d 444, 448 (9th Cir. 1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984). Its application

to military contractors, however, serves more than the historic purpose of not imposing liability on a contractor who has followed specifications required or approved by the United States government. It advances the separation of powers and safeguards the process of military procurement. We consider each of these values in turn.

The judicial branch is by design the least involved in military matters. "The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches." *Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973) (emphasis in original). Judges possess no power "To declare War ... To raise and support Armies ... To provide and maintain a Navy." U.S. Const. art. 1, sec. 8, cl. 11–13. Nor have they been "given the task of running the Army," *Orloff v. Willoughby*, 345 U.S. 83, 93, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953). In the face of a "textually demonstrable" commitment of an issue to "a coordinate political department," *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), judicial caution is advisable. Even apart from matters of constitutional text, the reservation of judicial judgment on strictly military matters is sound policy. The judicial branch contains no Department of Defense or Armed Services Committee or other ongoing fund of expertise on which its personnel may draw. Nor is it seemly that a democracy's most serious decisions, those providing for common survival and defense, be made by its least accountable branch of government.

It is difficult to imagine a more purely military matter than that at issue in this case—the design of a sophisticated reconnaissance craft that was flying, on the day of Tozer's death, some 50 to 75 feet above

---

1. We do not accept Tozer's argument that defendants waived the government contract defense by not setting it out in their answer. As the district court noted, the delay "was primarily due to the fact that the *McKay* case, which was the sole authority cited in their motion, had only recently been decided."

the surface of the water at a speed of 500–550 nautical miles per hour. It should be axiomatic that "considerations of cost, time of production, risks to participants, risks to third parties, and any other factors that might weigh on the decisions of whether, when, and how to use a particular weapon, are uniquely questions for the military and are exempt from review by civilian courts." *In re Agent Orange Product Liability Litigation,* 534 F.Supp. 1046, 1054 n. 1 (E.D.N.Y.1982).

Here, however, the jury was invited to "second-guess military decisions," *see United States v. Shearer,* — U.S. ——, 105 S.Ct. 3039, 3043, 87 L.Ed.2d 38 (1985), and to judge the design of a Navy-approved aircraft. Special interrogatory number one inquired of the jury whether defendants were "negligent in the design of the Buick Hood modification," and interrogatory five questioned whether the hood was "defective in that its design rendered it unreasonably dangerous." A group of laymen was thus ineluctably thrust into the intricacies of military technology involving, in the words of the district court, "the structural reaction of the modified Buick Hood panel to aerodynamic forces and loads experienced by the aircraft."

These are judgments, however, which lay men and women are neither suited nor empowered to make. There is a danger in transporting the rubric of tort law and products liability to a military setting and military technology. While jurors may possess familiarity and experience with consumer products, it would be the rare juror—or judge—who has been in the cockpit of a Navy RF–8G off the deck of a carrier on a low level, high speed fly-by maneuver. Moreover, "the United States is required by the exigencies of our defense effort to push technology towards its limits and thereby to incur risks beyond those that would be acceptable for ordinary consumer goods." *McKay,* 704 F.2d at 449–50. What would pose an unreasonable risk to the safety of civilians might be acceptable—or indeed necessary—in light of the military mission of the aircraft. *Cf.* Note, *McKay v. Rockwell International Corp.:*

*No Compulsion for Government Contractor Defense,* 28 St. Louis U.L.J. 1061, 1071 (1984) ("Plaintiff's comparison of the jeep to a civilian passenger vehicle was inappropriate since the two vehicles were not made for similar uses.") Difficult choices, tradeoffs, and compromises inhere in military planning that simply find no analogue in civilian life. "This is not to say that [military] designers are unconcerned with safety. Rather, they attempt to design as safe a plane as possible within the scope of its mission." *Kropp v. Douglas Aircraft Co.,* 329 F.Supp. 447, 456 (E.D.N.Y.1971).

The defense protects against judicial interference in military matters in other ways as well. We cannot accept the view that "the danger of interfering with [military] discipline in military contractor cases 'is too remote to be accorded significant weight when the decision only indirectly involves military orders or practices concerning active duty soldiers.'" *Shaw v. Grumman Aerospace Corp.,* 778 F.2d 736, 743 (11th Cir.1985), *quoting Cole v. United States,* 755 F.2d 873, 879 (11th Cir.1985). The fact that the challenge here does not involve Tozer's immediate commanding officer or relate to matters of personal discipline is irrelevant. Military contractors ordinarily work so closely with the military, *see* section III, *infra,* that it is nearly impossible to contend that the contractor defectively designed a piece of equipment without actively criticizing a military decision. Civilian scrutiny of such decisions is generally exerted through executive and legislative oversight on behalf of the public at large, not, as here, through the judiciary at the behest of an individual serviceman. In cases such as these, "members of the armed services would be allowed to question military decisions and obtain relief from actions of military officials." *Bynum v. FMC Corporation,* 770 F.2d 556, 565 (5th Cir.1985). Trial "would often require members of the Armed Services to testify in court as to each other's decisions and actions." *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 673, 97 S.Ct. 2054, 2059, 52 L.Ed.2d 665 (1977).

While debate over the safety and necessity of advanced weaponry is essential, the First Amendment does not require that the forum be the courtroom or the vehicle be a lawsuit.

The disallowance of recovery in these actions will not leave servicemen or their survivors without relief. The Veterans' Benefits Act "provides a swift, efficient remedy for the injured serviceman." *Stencel*, 431 U.S. at 673, 97 S.Ct. at 2058. Thus one classic rationale for tort liability—that of compensation of victims—is less compelling in this context. While the Veterans' Act does not provide all elements of damages in the usual wrongful death action, recovery is more reliable, and not "reduced by the high transaction costs present in ordinary products liability litigation." *McKay*, 704 F.2d at 452, n. 11.

Forcing military mishaps into the mold of products liability litigation carries one final drawback. Pilots of the Navy and Air Force, whose service and sacrifice make possible the security of this country, are not the military doubles of civilian motorists. Their lives are led in the company of peril. We can express it no better than Judge Sneed did for the court in *McKay*:

> [Pilots] recognize when they join the armed forces that they may be exposed to grave risks of danger, such as having to bail out of a disabled aircraft. This is part of the job. The Nation sometimes demands their very lives. This is an immutable feature of their calling. To regard them as ordinary consumers would demean and dishonor the high station in public esteem to which, because of their exposure to danger, they are justly entitled.

704 F.2d at 453.

### III

The second set of reasons for the government contractor defense also has its roots in military soil. Permitting recovery for design defects under any theory of liability risks altering the nature of the procurement process. Specifically, we anticipate that in the absence of the defense, there would be a decrease in contractor participation in design, an increase in the cost of military weaponry and equipment, and diminished efforts in contractor research and development.

Contractor participation in design is essential to the development of a military force that is competitively equipped. Equipment designs often are the result of "continuous back-and-forth" between the military and the contractor. *Koutsoubos v. Boeing Vertol*, 755 F.2d 352, 355 (3d Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985). The contractor and the military pool their expertise, matching the latest advances in military technology with the specific dictates of the mission. We recognize this back-and-forth as a reality of the procurement process, as well as a valuable part of that process; indeed if military technology is to continue to incorporate the advances of science, it needs the uninhibited assistance of private contractors.

■ Here the testimony at trial indicated that Vought worked closely with the Navy in developing the specifications for the aircraft. Vought's project manager for the RF-8G program testified that the engineering change proposal that included the Buick Hood modification was "a continual source of discussion" between Vought and the Navy, and that Navy engineers visited Vought every few months for progress reviews. The contractor's participation in design—or even its origination of specifications—does not constitute a waiver of the government contractor defense. If the defense were to be waived by such participation, the contractor would be trapped between its fear of liability and its desire to provide needed ideas and information. The "incentives for suppliers of military equipment to work closely with and to consult the military authorities in the development and testing of equipment" would be lost. *McKay*, 704 F.2d at 450. Without the defense, "military contractors would be discouraged from bidding on essential military projects." *Bynum v. FMC*, 770 F.2d at 566. Thus the defense will be permitted to a participating contractor so long as

government approval of design "consists of more than a mere rubber stamp." *Schoenborn v. Boeing,* 769 F.2d 115, 122 (3d Cir. 1985). If there is genuine governmental participation in the design, "the defense is available." *Id.*

Finally, disallowing the government contractor defense might raise the already high costs of military equipment. "Military suppliers, despite the government's immunity, would pass the cost of accidents off to the United States through cost overrun provisions in equipment contracts, through reflecting the price of liability insurance in the contracts, or through higher prices in later equipment sales." *McKay,* 704 F.2d at 449. Such pass-through costs would, of course, defeat the purpose of the immunity for military accidents conferred upon the government itself. *Stencel,* 431 U.S. at 673, 97 S.Ct. at 2059. While distribution of the costs of mishaps to the consuming public may be a familiar feature of products liability law, we are loathe to grant courts and juries a similar power to swell the public costs of meeting the nation's requirements in national security. Though one court has speculated that tort liability would provide legal incentives for "better-designed planes and fewer costly accidents," *Shaw,* 778 F.2d at 742, that judgment is not a matter for the judicial economists but for the Executive in its dealings with contractors and for the Congress in defining the scope of immunities under the Federal Tort Claims Act.

## IV.

There remains the application of the elements of the military contractor defense to the facts of this case. In *McKay,* the court held that

> a supplier of military equipment is not subject to [strict liability in tort] for a design defect where: (1) the United States is immune from liability under *Feres* and *Stencel*[2], (2) the supplier

proves that the United States established, or approved, reasonably precise specifications for the allegedly defective military equipment, (3) the equipment conformed to those specifications, and (4) the supplier warned the United States about patent errors on the government's specifications or about dangers involved in the use of the equipment that were known to the supplier but not to the United States.

704 F.2d at 451.

There is no question that Vought qualifies for the government contractor defense under this test. It is undisputed that the United States was itself immune from liability and that the Buick Hood modification conformed to specifications. The jury specifically found that the Navy reviewed and approved "reasonably detailed specifications for the Buick Hood modification," and, further, that the contractor did not fail "to notify the Navy of dangers created by the specifications which were known to defendants but unknown to the Navy."

Nevertheless, the district court upheld the verdict for Tozer on the basis of the jury's findings that defects in the design of the Buick Hood proximately caused plaintiff's death. The district court considered the defense "applicable to a cause of action based on strict liability," but unavailable to a "government contractor who is alleged to have established negligent design specifications."

■ In so holding, the trial court was in error. The defense applies "equally well to design defect cases based on negligence and/or breach of warranty claims." *Tillett v. J.I. Case Co.,* 756 F.2d 591, 597 n. 3 (7th Cir.1985); *see also Schoenborn.* The policies discussed earlier apply forcefully in either a negligence or a strict liability context. Courts are ill equipped to make military judgments, whatever a plaintiff's theory of recovery. In this case, the jury was

---

**2.** In *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), the government was held not liable under the Federal Tort Claims Act for injuries to servicemen in the course of military service. In *Stencel Aero Engineering*

*Corp. v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977), the United States was not required to indemnify a third party for damages paid by it to a member of the Armed Forces injured in the course of military service.

instructed that the government contractor defense barred recovery on strict liability, in part to prevent second-guessing of military decisions. But the jury still was compelled to evaluate the negligence claim, and thereby second-guess a design that the United States Navy had sanctioned. The danger that contractors will participate less and charge more stems from the threat of liability for government-approved technology, not from the particular theory of recovery.

In holding that the government contractor defense bars recovery on a theory of negligence as well as strict liability, we join the growing ranks of circuit courts that recognize the utility of the defense and its inescapable function in the deflection of unwarranted judicial oversight over matters of procurement and defense.[3] *Koutsoubos v. Boeing Vertol*, 755 F.2d 352 (3d Cir.1985); *Bynum v. FMC*, 770 F.2d 556 (5th Cir.1985); *Tillett v. J.I. Case*, 756 F.2d 591 (7th Cir.1985); *McKay v. Rockwell Int'l Corp.*, 704 F.2d 444 (9th Cir.1983). *But see Shaw v. Grumman Aerospace*, 778 F.2d 736 (11th Cir.1985). This case involves no more than a standard application of such principles. The judgment of the district court is accordingly reversed and remanded for entry of judgment in favor of defendants.

REVERSED AND REMANDED.

---

3. Though the cause of action here was brought under federal law, the defense would apply equally to suits under the diversity jurisdiction. "With regard to the government contractor defense, most of the courts that have considered the matter have found that, at least when military design specifications provided by the government are at issue, product liability actions are likely to involve matters that are subject to exclusive federal control and necessitate the limited imposition of federal common law." *Bynum*, 770 F.2d at 567, *et seq.* The fact that a claim arises under state law does not, of course, preclude a federal defense in an area of paramount federal interest. *Id.;* Note, *Government Contract Defense: Sharing the Protective Cloak of Sovereign Immunity After McKay v. Rockwell International Corp.*, 37 Baylor L.Rev. 181, 214 (1985).