Donna K. DOWD, Widow of Douglas Loel Dowd, Deceased; Charles D. Dowd, minor, surviving son of Douglas Loel Dowd, Deceased, by his mother and next friend, Donna K. Dowd; Dawn Dowd, minor, surviving daughter of Douglas Loel Dowd, Deceased, by her mother and next friend, Donna K. Dowd; Donna K. Dowd, Personal Representative of the Estate of Douglas Loel Dowd, Deceased; Catherine Ellis, Widow of Robert Schild Ellis, Deceased; Michael Ellis, infant, surviving son of Robert Schild Ellis, Deceased, by his mother and next friend, Catherine Ellis; Steven Ellis, infant, surviving son of Robert Schild Ellis, Deceased, by his mother and next friend, Catherine Ellis; Catherine Ellis, Personal Representative of the Estate of Robert Schild Ellis, Deceased, Appellees,

v.

TEXTRON, INC., a Delaware Corporation; Bell Helicopter Textron, Inc., a Division of Textron, Inc., a Delaware Corporation, Appellants.

No. 85–1704.

United States Court of Appeals, Fourth Circuit.

Argued March 6, 1986.

Decided May 27, 1986.

Rehearing and Rehearing In Banc Denied June 25, 1986.

---

**410**

James W. Hunt (James M. FitzSimons, Mendes & Mount, New York City, R. David Broiles, Brown, Herman, Scott, Dean & Miles, George Galerstein, Fort Worth, Tex., Bell Helicopter Textron, Inc., Charles M. Shaffer, Jr., L. Joseph Loveland, Gary J. Toman, Jane E. Jordan, King & Spalding, Atlanta, Ga., on brief), for appellants.

John H. Green, Odessa, Tex., for appellees.

Before RUSSELL, HALL and WILKINSON, Circuit Judges.

PER CURIAM:

Two servicemen, Douglas Dowd and Robert Ellis, were killed when the helicopter they were flying crashed during a flight instruction session at Patuxent River, Maryland. Donna Dowd and Catherine Ellis, the widows of the servicemen, brought suit on behalf of themselves and their children against Textron, Incorporated and its subsidiary Bell Helicopter Textron, the manufacturer of the helicopter. The plaintiffs alleged negligence and strict liability for the design of the rotor system installed on the helicopter. The jury returned a general verdict of $3,650,000 in favor of the plaintiffs, and the district court denied the customary post-trial motions.

We reverse. The defendant has satisfied all elements of the military contractor defense as set forth in *Tozer v. LTV Corp.*, 792 F.2d 403 (4th Cir. 1986). The decision of the United States Army to contract with Bell for a helicopter rotor system with which the Army had extensive familiarity and field experience operates to shield defendant from any liability for alleged design defects in that system.

### I.

The crash occurred on May 21, 1981, during a "familiarization flight" at the U.S. Naval Test Pilot School at Patuxent River. The plaintiffs alleged that the accident occurred because the hub of the rotor system struck the mast and severed it, a phenomenon known as "mast bumping." The rotor is the system of blades that revolve to support the helicopter's flight. The rotor is attached to a rotating mast. If the rotor dips at an extreme angle and the mast remains stationary, the hub of the rotor may strike the mast and sever it. When mast bumping occurs in flight, it is generally catastrophic because the rotor separates from the mast, and the helicopter can no longer fly. In this case, the separated rotor flew off and the blades cut through the cockpit of the helicopter.

The helicopter flown by Dowd and Ellis had a 540 rotor system that Bell designed in the early 1960's, and installed on the UH–1 series of helicopters that it built for the Army between 1961 and 1967. In 1965, Bell developed the AH–1G helicopter, a de-

rivative of the UH–1C, and installed the 540 rotor system on the AH–1 series as well. In 1978, the Army entered into a contract with Bell to modify the AH–1G to an AH–1S. The modification added mission equipment to the helicopter; the rotor system was not changed.

The mast bumping accident that occurred at Patuxent River in 1981 was not an isolated incident. Bell and the Army had previously investigated and exchanged information on the problem of inflight mast bumping. In 1973, the Army prepared a report on forty-six instances of mast bumping between 1967 and 1972. That report concluded that the teetering rotor system had unstable characteristics, and recommended further study of the problem. In 1974, the Army published a technical risk assessment report on inflight mast bumping with AH/UH helicopters. The 1974 report concluded that mast bumping was associated with maneuvers at low g levels and with "high speed flight with extreme nose left sideslip." The report recommended educating pilots about the potential for mast bumping during certain maneuvers and advocated a long-term investigation into redesign of the mast and rotor. While the Army was preparing its reports, Bell and the Army exchanged information on the design of the rotor system and pilot performance. Bell also did a series of in-house studies.

In the late 1970's, Bell proposed three rotor system modifications that it hoped would reduce mast bumping: the hub spring, the mast plug, and the four-bladed rotor. The mast plug is inserted into the hollow mast to provide additional resistance if the mast is bumped by the hub. The Army approved the mast plug modification for UH–1 helicopters with thin walled masts, but rejected Bell's proposal to put mast plugs on AH–1 helicopters. At the time of the accident, the Army had not installed hub springs on either the UH–1 or AH–1 helicopters. Bell did not actually propose the four bladed rotor system until 1979 and 1980, after the 1978 modification but before the accident in 1981. The record suggests various reasons why the Army did not adopt Bell's proposed modifications: the modifications were thought ineffective or too costly, or would have interfered with the military mission of the helicopter by impairing performance because of additional weight the modifications might add.

## II.

To avoid liability under the military contractor defense, Bell must demonstrate that it has met the requirements outlined in *Tozer*. A supplier of military equipment is not liable in tort for design defects when: 1) the United States is immune from liability; 2) the United States established or approved reasonably precise specifications for the equipment; 3) the equipment conformed to those specifications; and 4) the supplier warned the United States about dangers involved in the use of the equipment that were known to the supplier but not to the United States. *See Tozer*, at 408. Here, the Army was immune from liability under *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), and we find that the other elements of the defense have been satisfied.

█ The elements of the defense do not vary with plaintiffs' theory of recovery. The district judge instructed the jury on the government contractor defense, but gave different instructions for strict liability and negligence. The instructions for strict liability were appropriate, but the district judge's characterization of the defense as it applies to negligence was erroneous. The judge instructed the jury to "note that the government contractor defense is different for strict liability than for negligence: the government must actually design or mandate or compel the design in question under negligence—under strict liability the government must only establish or approve reasonably precise specifications for the allegedly defective design." As we said in *Tozer*, the elements of the government contractor defense remain the same whether plaintiff's theory of recovery

is one of negligence or strict liability. Under either theory, government approval of equipment specifications, not design or dictation of them, is all that is required.

■ Plaintiffs argue that since Bell originally designed the 540 rotor system in the early 1960's without any participation by the Army, the government neither set nor approved reasonably detailed specifications. That argument overlooks a wealth of subsequent history. The Army had been using helicopters equipped with the 540 rotor system for some twenty years before Ellis and Dowd's accident; almost 9,000 UH–1 and AH–1 helicopters flew in Vietnam. The Army had investigated and analyzed incidents of mast bumping in the early 1970's, discussed the problem at some length with Bell, and prepared two reports on inflight mast bumping. The length and breadth of the Army's experience with the 540 rotor system—and its decision to continue using it—amply establish government approval of the alleged design defects.

The district court acknowledged that in 1978 the Army required Bell to use the 540 rotor system on the AH–1S: "All of the following assertions made by Bell are correct: The Army did enter into a contract with Bell to *inter alia* install an Army requisitioned 540 Rotor System ('teeter-totter') on the AH–1S helicopter; the Army did not request or order installment of any of the available safety devices mentioned above, despite knowing something of the existence and/or efficacy of these devices; and finally, Bell was not allowed under the contract to install such devices without the permission of the Army."

The required installation of the 540 rotor system in the AH–1S helicopter may reflect the Army's judgment that, despite the defects alleged in this tort suit, the equipment had largely accomplished its mission and proved its military worth. It may reflect the Army's view that safety problems were remediable through pilot training, or that any alteration of the rotor system entailed increased risks or costs. It may

simply reflect the Army's disinclination to tinker with a system that had over time worked well enough. Whatever the reasons, it is not up to the jury to second-guess this military judgment.

Nor was it within the power of the contractor to do so. The military contractor is not in the position of the manufacturer of consumer goods. Even if it developed the original design for a piece of equipment, as Bell did in the early 1960's, it cannot modify that design without United States approval. To uphold a verdict against the contractor under these circumstances would be to impose liability without responsibility, and we decline to do so here.

Nor is the Army, as plaintiff argues, in the position of the beguiled and unsophisticated consumer. *Cf. Tozer*, at 406. The Army was familiar with the capabilities and problems of the 540 rotor system; it had completed its own technical risk assessment of the problem of mast bumping; it declined to implement three suggestions—for a hub spring, a mast plug, and a four-bladed rotor system—that Bell thought might alleviate it. While plaintiff naturally disputes the efficacy of those proposals, the contractor's every suggestion is not to be judged on whether it ultimately proves to be a panacea. If, as the district court intimated, design of the original equipment fixed Bell's negligence for the indefinite future, Bell's incentive to propose safety modifications for its product might well be undermined. Much machinery undergoes safety refinements during the course of its useful life, and we see every reason to encourage such an evolution in military equipment.

III.

In sum, the Army approved the 540 rotor system for the AH–1S helicopter in an atmosphere of awareness and in the light of experience. Bell Helicopter, in turn, established the elements of the military contractor defense. The district court thus erred in submitting the matter to the jury. We

reverse its decision and remand with directions to enter judgment for defendant.

REVERSED.