Lora L. **WILSON**, et al.

v.

The **BOEING COMPANY**, et al.

**Civ. A. No. 84–3619.**

United States District Court,
E.D. Pennsylvania.

Feb. 18, 1987.

**768**

Louis S. Franecke, Mack, Hazlewood, Franecke & Tinney, San Francisco, Cal., for plaintiffs.

Harry A. Short, Jr., John M. Corcoran, Liebert, Short, Fitzpatrick & Lavin, Philadelphia, Pa., for defendants.

RAYMOND J. BRODERICK, District Judge.

In this action, the plaintiffs seek to recover damages on account of the death of RMC Larry Joe Wilson which occurred after an unsuccessful single engine landing of a United States Navy CH–46D helicopter on the high seas near the island of Diego Garcia in the Indian Ocean. The jurisdiction of this Court is based on diversity of citizenship, 28 U.S.C. § 1332, and on the Death on the High Seas Act, 46 U.S.C. §§ 761–767. Federal law applies.

Plaintiffs filed this suit against The Boeing Company, Boeing-Vertol Company ("Boeing defendants") and General Electric Company ("General Electric") seeking recovery on theories of negligence, strict liability and breach of warranty. The plaintiffs entered into a settlement agreement with the Boeing defendants, and a Local Rule 23(b) Order was entered dismissing plaintiffs' claims against the Boeing defendants with prejudice on October 10, 1985. Plaintiffs have continued to pursue their claims against General Electric, the manufacturer of the T58–GE–10 engine with which the CH–46D helicopter was equipped.

Plaintiffs base their claim against General Electric on the alleged defective design of the lubrication system of the T58–GE–10 engines supplied to the government. They have identified the defective design as the absence of any warning device, mechanism or indicator which would enable the flight crew to determine that the engine's oil filter was about to or had become clogged to the point where oil flow would bypass the filter and enter the system through a bypass valve in an unfiltered condition containing potential contaminants which could result in the loss of oil system function. Plaintiffs further contend that General Electric was in some way responsible for the United States Navy's failure to set forth procedures in the Naval Air Training and Operating Procedures Standardization Program ("NATOPS") manual to enable flight personnel to respond to a high oil pressure gauge reading.

■ Following discovery, General Electric moved for summary judgment in May, 1986 relying upon the government contractor defense which shields government contractors from liability to third parties for design defects in products supplied in accordance with government specifications. The Court denied that motion in June, 1986 after concluding that there were genuine issues of material fact precluding the entry of summary judgment. General Electric has renewed its motion for summary judgment, having supplemented the record with additional facts by way of affidavit. The record at this time is such that the facts contained in the affidavits and admissions demonstrate that no genuine issue of material fact remains, and that defendant General Electric has satisfied all of the elements of the government contractor defense as adopted by the Third Circuit in *Koutsoubos v. Boeing Vertol*, 755 F.2d 352 (3d Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985). Therefore, General Electric's motion for summary judgment will be granted.

### I.

The crash of the subject helicopter occurred on February 28, 1983 during a flight from Diego Garcia to the U.S.S. Dale via the U.S.S. Santa Barbara on a routine "pax/mail/cargo mission." After landing on the deck of the U.S.S. Santa Barbara to discharge mail and passengers, and after the helicopter had refueled, it departed for the U.S.S. Dale. A short time after departure from the U.S.S. Santa Barbara, an increase in the oil pressure of the No. 2 engine was noted with the pressure climbing above the normal operating limits of 27 to 67 PSI to 70 to 76 PSI and continuing to rise to the limits of the gauge. After examining the engine and consulting the NATOPS manual in an effort to devise a solution, finding no emergency procedures in the NATOPS manual applicable to the situation, and moving the No. 2 engine condition control lever from "FLY" to "START" with no resulting decrease in oil pressure, the flight crew secured (shut down) the No. 2 engine. The aircraft changed course in order to return to the U.S.S. Santa Barbara

for an emergency landing. The crew planned to land the aircraft on the flight deck of the U.S.S. Santa Barbara which should have been feasible with only one engine; however, either due to a power failure in the remaining engine or because of other prevailing conditions, and in order to avoid the possibility of a crash on or adjacent to the flight deck, an emergency landing was made in the sea immediately astern of the deck of the U.S.S. Santa Barbara.

Upon exiting the helicopter, the crew and passengers grouped together and determined that RMC Wilson was missing. Although a search was undertaken, the body of RMC Wilson was not recovered. Furthermore, because the crash resulted in the sinking of the helicopter in approximately 550 meters of water, no first-hand analysis of any mechanical malfunctions was possible, and therefore, the United States Navy has never reached any conclusive determination of the precise cause of the mishap.

General Electric has submitted the affidavits of William M. Meyer, the current manager of General Electric's T58/T64 program who has been involved in the T58 or T58/T64 programs in various capacities since 1959, and Ferdinand Mikel who was a civilian employee of the United States Department of the Navy from 1954 to 1980 and a manager of the Standards and Specifications Unit of the Propulsion Division of the Bureau of Aeronautics (a/k/a Bureau of Weapons or NAVAIR, hereinafter, "Bureau of Aeronautics") from approximately 1960 to 1975. These affidavits establish that the CH–46D helicopter, Bureau No. 152508, involved in the subject accident was equipped with two T58–GE–10 engines, serial numbers 281760 and 281132.

Engine 281760 was supplied to the government pursuant to Contract No. AF33(657)–16830, effective June 30, 1966, which required General Electric to provide one hundred ninety-three (193) T58–GE–10 turboshaft engines for installation on SH–3D and CH–46D helicopters and for use as spare engines.

Similarly, engine 281132 was supplied to the government pursuant to Contract No. AF33(657)–14875, effective September 2, 1966, which required General Electric to provide four hundred eighty-seven (487) T58–GE–10 turboshaft engines for installation on SH–3D, UH–46D and CH–46D helicopters and for use as spare parts.

The contracts pursuant to which the engines were supplied to the government by General Electric required that the T58–GE–10 engines for use in the CH–46D helicopters be manufactured in accordance with specification E–1081, dated June 14, 1963, including approved engineering change proposals and approved engineering changes as of the effective date of the respective contracts. Specification E–1081 is a detail specification which incorporates, where applicable, military specification MIL–E–8593, the general military specification for engines, aircraft, turboprop, dated September 3, 1954.

The affidavits reflect that the T58–GE–10 model engine was developed by General Electric and the United States Navy specifically for use by the Navy, and that the applications of the engine were determined by the Navy according to its requirements. The final specification, i.e. E–1081, pursuant to which the T58–GE–10 engine was produced was the result of the joint efforts of the United States Navy and General Electric to draft language which would accomplish the Navy's intended requirements for the engine, and which would allow General Electric to produce a product which it was capable of manufacturing. In the course of manufacturing the T58–GE–10 engine, General Electric was not at liberty to deviate from the detail specification without the government's approval.

General military specification MIL–E–8593 was established by the government and by its own terms was approved by the Bureau of Aeronautics, Department of the Navy.

Detail specification E–1081 was approved by the Bureau of Aeronautics in June, 1963 after detailed review and analysis of the proposed specification, discussions with the General Electric engineering staff, and qualification testing. The Standards and Specifications Unit of the Bureau of Aeronautics was the unit responsible for negotiating model specifications for particular aircraft engines, and the process of approval of the specifications was initiated in that unit.

More specifically, the approval process for detail specification E–1081 began with the proposed detail specification being submitted to the Standards and Specifications Unit for review, input and consideration. After review, the proposed specification was then the subject of discussions between General Electric representatives and the representatives of the Bureau of Aeronautics. As a result of these discussions, specific detail design and performance requirements were established, as were the requirements for qualification and acceptance testing. The United States Navy personnel involved in the review, analysis and discussion included personnel with engineering backgrounds who were thoroughly familiar with, and knowledgeable regarding the development and operation of turboshaft engines.

As pointed out heretofore, the levels of qualification and acceptance testing of the T58–GE–10 model engine were determined by the United States Navy. The engine was subjected to qualification testing in accordance with section 4 of the detail specification and Navy mandates. This qualification testing was subject to Navy participation, inspection, analysis, and approval. It required detailed and comprehensive testing of the overall engine and its components during operation, and included engine disassembly and component inspection. United States Navy personnel inspected the parts and/or components of the engine after testing, and those personnel were provided with inspection reports concerning the testing and inspection. Successful completion of the testing and exhibition of compliance with Navy requirements was required prior to the production of the T58–GE–10 model engine. This qualification testing is an integral part of engine development and is monitored carefully by the government.

In addition, acceptance testing was performed on the T58–GE–10 engines pursuant to the specifications. This testing was also subject to government inspection, approval, and participation. In short, every feature of the T58–GE–10 engine was tested and inspected pursuant to and for conformity with Navy specifications.

The allegedly defective lubrication system and its components were developed and approved as part of the United States Navy's review and approval of the specifications. As approved, detail specification E–1081, including the model specification prints, was not designed to include and did not require any type of device, mechanism or indicator, such as a pop-out device, to show impending oil filter bypass. This is so although, at the time of the approval of detail specification E–1081, the United States Navy was aware that under certain conditions, oil pressure could exceed 75 PSI. After production began, changes in the design of the lubrication system of the T58–GE–10 engine could only be made with concurrence by the government in the change, and after government review of the feasibility and desireability of the change.

The T58–GE–10 engines with which the subject CH–46D helicopter was equipped (serial numbers 281132 and 281760) conformed with the detail and general specifications and all Navy requirements. Both engines were produced in accordance with the respective government contracts.

The affidavits and admissions submitted by General Electric reflect that the oil pressure readings experienced during this incident and after the pilot adjusted the controls of the No. 2 engine were a unique manifestation, and that General Electric has no knowledge of a similar occurrence involving a T58–GE–10 model engine under these conditions.

The Navy was aware of the potential for high oil pressure problems with the T58–GE–10 engine. The engine oil pressure guage used in this aircraft is calibrated up to 100 PSI where normal oil pressures range from 24 to 67 PSI with the maximum acceptable operating oil pressure at 75 PSI.

Furthermore, the United States Navy maintenance procedures specifically provide for observation, inspection and cleaning of engine oil filters and require that an engine serviceability check be performed where contamination of an unusual nature is found or where there is evidence of excessive amounts of normal contaminants on magnetic drain plugs or in the lube filter. This procedure required, *inter alia*, the removal of the bypass valve, the draining of oil, and the changing or cleaning of oil filters.

As a practical matter, at the time of this accident in 1983, the United States Navy was familiar with and knowledgeable regarding the characteristics of the T58–GE–10 engines. Pursuant to the two contracts involved in this case over six hundred (600) T58–GE–10 model engines were delivered by General Electric to the government in 1966 and 1967. Therefore, for a period of over fifteen years, the T58–GE–10 engines were regularly used and maintained by the United States Navy and the other government agencies which may have received them, yielding experience and knowledge regarding the operation and maintenance of the engines through complaints, and incident and accident reports.

The investigation report of this incident prepared by the Judge Advocate General, dated March 31, 1983, reflects that no emergency procedures for high engine oil pressures are listed in the NATOPS flight manual, and recommends that such operating procedures be developed and incorporated into the NATOPS flight manual. The NATOPS flight manual is issued by the authority of the Chief of Naval Operations and under the direction of the Commander, Naval Air Systems Command. The document is not authored or promulgated by General Electric.

## II.

In *Koutsoubos v. Boeing Vertol,* 755 F.2d 352 (3d Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985), the Third Circuit adopted the three-part test of the government contractor defense first announced by Judge Pratt in *In*

re "Agent Orange" Product Liability Litigation, 534 F.Supp. 1046 (E.D.N.Y.1982). The test requires that a defendant asserting the defense prove each of the three elements of the defense by a preponderance of the evidence. *McKay v. Rockwell International Corp.*, 704 F.2d 444, 453 (9th Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984); *Agent Orange,* 534 F.Supp. at 1056. These elements are:

(1) That the government established or approved the specifications for the product;

(2) That the manufacturer complied with these specifications; and

(3) That the government knew as much as or more than the contractor about the hazards of the product.

*Koutsoubos,* 755 F.2d at 354–55. *See also In re Air Crash Disaster at Mannheim Germany,* 769 F.2d 115, 121 (3d Cir.1985), *cert. denied sub nom. Schoenborn v. Boeing Co.,* —— U.S. ——, 106 S.Ct. 851, 88 L.Ed.2d 891 (1986) (applying Pennsylvania law); *Powell v. Boeing Vertol Co.,* No. 84–5503, slip op. at 4 (E.D.Pa. Dec. 4, 1986) [Available on WESTLAW, DCTU database]; *Humphreys v. The Boeing Co.,* No. 85–4524, slip op. at 4 (E.D.Pa. July 17, 1986) [Available on WESTLAW, DCTU database]. Where applicable, the government contractor defense bars all of a plaintiff's claims, regardless of the theory of recovery. *Tozer v. LTV Corp.,* 792 F.2d 403 (4th Cir.1986); *Agent Orange,* 534 F.Supp. at 1055.

The court in *Koutsoubos* outlined the five public policy justifications for the *Agent Orange* approach. First, to hold military contractors liable could subvert the government's immunity under *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), and *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977), since contractors could pass the cost of accidents along to the government. Second, holding military contractors liable would thrust the judiciary into the making of military decisions, an area which is circumscribed based upon separation of powers concerns. Third, military contractors are often unable to negotiate over specifications which, due to defense requirements, involve risks that may be considered unreasonable for ordinary consumer goods. Fourth, the *Agent Orange* approach encourages military contractors to work closely with military authorities in the development of equipment. Finally, the third prong of the *Agent Orange* test (that the government knew as much as or more than the contractor about the hazards of the product) has been interpreted as creating a duty to warn on the part of the contractor, so that military procurement decisions are made on the basis of readily available information.

A. *Government Approval of Detail Specifications for the T58–GE–10 Turboshaft Engines*

The first issue is whether there is any genuine issue of material fact with regard to whether the government established or approved the general and detail specifications for the model T58–GE–10 engine manufactured by General Electric.

■■■ To satisfy its burden of proof on this element of the defense, the contractor must prove that the product it supplied was a particular product specified by the government. *Agent Orange,* 534 F.Supp. at 1056. It is sufficient for the contractor to show that the government approved the specification through "continuous back and forth" negotiations between the contractor and the military, even though the majority of the specifications originated with the contractor. *Koutsoubos,* 755 F.2d at 355. *See also Tozer,* 792 F.2d at 407 (contractor's participation in design—or even its origination of specifications—does not constitute a waiver of the government contractor defense); *Mannheim,* 769 F.2d at 122. The defense is available to a contractor so long as the government's approval consists of more than a mere rubber stamp and so long as the government contract sets forth more than a mere "performance specification." *Koutsoubos,* 755 F.2d at 355; *Mannheim,* 769 F.2d at 122. It is not necessary for the contractor to show that

the government established or approved the specifications with knowledge of their dangerous characteristics. *Powell,* slip op. at 10.

The undisputed facts in the record establish that detail specification E–1081 was approved by the Bureau of Aeronautics after review and analysis of the proposed model specification by military engineering personnel, and discussions and negotiations between General Electric and military personnel. The detail specification was established by the joint efforts of General Electric and the Navy in order to conform with the Navy's specific detail design and performance requirements and was subject to qualification and acceptance testing by General Electric with the participation of the Bureau of Aeronautics. General Electric was not at liberty to deviate from the specifications without government approval in the change.

■ Plaintiffs interpret the first prong of the *Agent Orange* test as requiring the contractor to show that there were continuous back and forth discussions or negotiations regarding the inclusion or exclusion of the specific design deficiency alleged in this case. This Court rejects plaintiffs' interpretation of the first prong of the government contractor defense. This is not the formulation of the defense adopted by the Third Circuit in *Koutsoubos.* It is sufficient for the contractor to show, as was done here, that the overall detailed specification was established or approved by the government.

■ In addition, plaintiffs point to the government's contract with The Boeing Company, dated March 9, 1965, paragraph DD, which provides that, "[i]n releasing design data or drawings, or in releasing aircraft for flight, the Government accepts no responsibility for the successful operation of the equipment manufactured by the contractor," contending that this provision "takes this case out of the [g]overnment [c]ontractor [d]efense." Plaintiffs assert without providing any support in the record that this provision applies to the T58–GE–10 engines manufactured by General Electric. Initially, it must be noted that the "contractor" referred to in the above-quoted provision is identified on the cover page of the contract (NOw(A)–65–0130–f) as "The Boeing Company (Vertol Division)." The T58–GE–10 engines in question manufactured by General Electric do not appear to be covered under the terms of the contract with Boeing, and were not "manufactured by the contractor," Boeing. Finally, even if this contract provision applied to General Electric, this Court does not believe that it would abrogate the government contractor defense. Where the government is immune from liability under *Feres* and *Stencel,* the courts have held that the government contractor is likewise immune if it can prove the three elements of the defense. The government's attempt in the Boeing contract to shift liability for defective design of military equipment, liability which the government does not have, cannot be construed to abrogate the government contractor defense. Furthermore, the public policy justifications for the adoption of the government contractor defense outlined in *Koutsoubos* apply with equal force regardless of this provision. Therefore, in this Court's opinion, such a provision does not affect the applicability of the government contractor defense.

■ Plaintiffs in their original brief in opposition to General Electric's motion for summary judgment contended that specification E–1081 was merely a "performance specification" and that therefore, the government contractor defense should be restricted. *Koutsoubos,* 755 F.2d at 355. Plaintiffs however have failed to come forward with any affidavit, deposition, answers to interrogatories or admissions in support of this contention, but have relied upon this simple, unsubstantiated assertion. General Electric, on the other hand, has provided affidavits describing specification E–1081 as a detail specification. When faced with this situation, this Court has no alternative but to find that there is no genuine issue of material fact as to whether specification E–1081 was in fact a detail specification, and that the government contractor defense applies with full force in this case.

### B. *Manufacturer Compliance With Specifications*

The second issue is whether there is any genuine issue of material fact as to whether General Electric complied with detail specification E–1081.

■ Failure of a contractor to conform to the specifications defeats the defense only if the discrepancy was a material one. *Agent Orange,* 534 F.Supp. at 1057.

■ The affidavits submitted by General Electric reflect that the T58–GE–10 engines conformed with detail specification E–1081, and that the engines were subjected to acceptance testing by General Electric with participation of the United States Navy. Plaintiffs have failed to raise any genuine issue of material fact with regard to the second prong of the defense.

### C. *Relative Knowledge of the Alleged Hazard*

■ The third and final element of the defense requires the contractor to establish that the government knew as much or more than the contractor about the hazards of the product as designed. *Agent Orange,* 534 F.Supp. at 1057. Under this prong of the defense, a contractor can be held liable despite the fact that it met the specifications established or approved by the government "only if [it] concealed or failed to disclose to the government information about the hazards of which the government was ignorant." *Agent Orange,* 534 F.Supp. at 1057. A contractor can be insulated from liability where in addition to showing compliance with specifications established by the government, it can show that it was not aware of hazard-causing deficiencies in the specifications. *Agent Orange,* 534 F.Supp. at 1057.

According to General Electric's affidavits, it was not aware of any similar occurrence under these conditions with regard to the T58–GE–10 engine. On the other hand, the Navy was aware that the oil pressure of the subject engines could rise above normal operating limits, the oil pressure gauges having been calibrated to warn of above-average pressure ranges. Further-more, the design itself reflects an awareness of the potential for abnormal contamination of the filter by providing for the bypass valve which will allow oil to reach the engine after the filter has become clogged.

In addition, as to any continuing duty to warn, there is no factual information in the record which would show that General Electric learned of the alleged defect after the government's approval of the design and failed to warn the government. As a matter of fact, the government itself had over fifteen years of operating and maintenance experience with 600 of these T58–GE–10 engines manufactured by General Electric, as well as the benefit of any complaints, or incident and accident reports involving this engine. The maintenance procedures developed by the Navy reflect a concern with oil contaminants, the engine lube filter and bypass valve, requiring the removal of the valve, and the changing or cleaning of the filter as part of its engine serviceability check.

Plaintiffs have supplied the Court with various documents some of which appear to be internal General Electric reports and memoranda, while others appear to be Navy documents or correspondence between General Electric and the military. While the documents reflect a general awareness by General Electric of some lubrication system problems, the documents do not demonstrate an awareness by General Electric of the alleged defectiveness of the design, that is, a condition which would require the installation of a warning device, mechanism or indicator to enable the flight crew to determine that the oil filter had become clogged. Plaintiffs have produced documents relating to oil cooler ruptures, damage to O-rings due to improper filter maintenance, high oil consumption and pressurizing of the QEC tank, lube sump flooding problems, assembly damage to the wrenching hex causing oil to vent from the front frame, and a document which appears to be from General Electric to a Marine Corps Administrator regarding inconsistencies between the engine and oil frame manuals on engine lube pressure limitations.

None of these documents relate to the alleged design defect complained of by plaintiffs. Furthermore, the only document which does reflect an awareness by General Electric of lubrication system contamination likewise reflects the military's awareness of the problem. That document discusses a military/industry symposium during which the Air Force revealed that it had initiated a Spectrometric Oil Analysis Program to detect oil contamination on 60,000 Air Force engines to assist in diagnosis of contamination problems.

■ Plaintiffs have simply not come forward with any facts that demonstrate that there is any genuine issue of material fact, that is, any fact showing that General Electric possessed more knowledge than the government concerning the alleged defective design, or that General Electric had any material information which it failed to disclose to the government. Therefore having established each of the elements of the government contractor defense as to the alleged defective design of the T58–GE–10 engine, General Electric is entitled to summary judgment as a matter of law.

### III.

Plaintiffs also seek to hold General Electric liable for the failure of the NATOPS manual to include emergency operating procedures for use whenever engine oil pressure exceeds normal limits in connection with the T58–GE–10 engine. Plaintiffs reason that because there was nothing in the NATOPS manual regarding high oil pressure, the Navy did not know about it because if the Navy knew about it, an emergency procedure would have been included in the NATOPS manual.

As pointed out above, the NATOPS flight manual is issued by the authority of the Chief of Naval Operations and under the direction of the Commander, Naval Air Systems Command. The document is not authored or promulgated by General Electric.

■ Plaintiffs have not presented any fact which in any way connects General Electric with the preparation of this manual. There is a complete absence of any showing by affidavit, deposition, answers to interrogatories or admissions which would form a basis for holding General Electric liable for an omission in the NATOPS manual. Furthermore, as pointed out in the discussion of the government contractor defense, plaintiffs have failed to provide any facts demonstrating that General Electric withheld any information or that General Electric had any information which could have served as a basis for cautionary instructions in the manual.

Therefore, for the reasons set forth above, summary judgment will be granted in favor of defendant General Electric.